**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

BASEM NAJJAR, a/k/a Bassem Najjar,
a/k/a Basim Najjar, a/k/a Bassim
Najjar, t/a Clinton Auto Sales,
*Defendant-Appellant.*

No. 00-4296

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TRI-CITY AUTO OUTLET,
INCORPORATED,
*Defendant-Appellant.*

No. 00-4305

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

BASEM NAJJAR, a/k/a Bassem Najjar,
a/k/a Basim Najjar, a/k/a Bassim
Najjar, t/a Clinton Auto Sales,
*Defendant-Appellant.*

No. 00-4650

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

              v.                                    No. 00-4654

TRI-CITY AUTO OUTLET,
INCORPORATED,
                    *Defendant-Appellant.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CR-98-505-DKC)

Argued: January 25, 2002

Decided: August 6, 2002

Before WIDENER and GREGORY, Circuit Judges, and
Cynthia H. HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Widener wrote the opinion, in
which Judge Gregory and Senior Judge Hall concurred.

**COUNSEL**

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Green-
belt, Maryland, for Appellant Najjar; Timothy Joseph Sullivan, SUL-
LIVAN & SULLIVAN, College Park, Maryland, for Appellant Tri-
City. Stuart A. Berman, Assistant United States Attorney, Greenbelt,
Maryland, for Appellee. **ON BRIEF:** Beau Kealy, MARCUS &
BONSIB, Greenbelt, Maryland, for Appellant Najjar. Stephen M.

Schenning, United States Attorney, Rod J. Rosenstein, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

## OPINION

WIDENER, Circuit Judge:

### INTRODUCTION

Basem Najjar and Tri-City Auto Outlet, along with two others not involved in this appeal, were indicted in a 23-count indictment on federal mail fraud, possession, transportation, and money laundering charges arising from a theft and chop shop ring headed by Najjar. At trial, a jury convicted Najjar of 18 of the counts in the indictment and Tri-City of all 9 counts alleged against it. The district court ordered Najjar to serve 132 months in prison, forfeit $2,760,000 in cash and assets, and pay restitution of $211,166.04 and special assessment fees. The court ordered Tri-City to pay $43,617 in restitution, special assessments, and forfeit its interest in specified assets totaling $2,760,000.

Najjar contends that the district court erred in denying his motions for severance and mistrial, and suppression of evidence obtained pursuant to allegedly illegal searches. Tri-City takes issue with the sufficiency of the evidence supporting its convictions as well as the district court's denial of its motion to dismiss based on prosecutorial vindictiveness. Najjar also contends that *Cleveland v. United States*, 531 U.S. 12 (2000), requires reversal of his mail fraud convictions. Both defendants challenge their RICO forfeitures, and, finally, the district court's failure to define reasonable doubt in its jury charge.

### I. FACTS

Basem Najjar, Clinton Auto Sales, Tri-City, and numerous others were involved in a car theft and sale ring. Their mode of business was to steal expensive, late model cars from the Washington, D.C. area, and strip them of parts. The cars would then be abandoned for the police to find. The insurance companies holding the policies on the

cars would declare them total losses, and sell the recovered vehicles for salvage. Najjar and his agents would then buy the salvaged cars at insurance auctions and use them for reassembly. This scheme involved two Maryland State Police Officers who secured certificates of title for Najjar outside of the normal retitling process for salvaged vehicles. This allowed Najjar to use the stolen parts in the reassembly of the salvaged cars without having to worry about vehicle identification number (VIN) checks that would reveal the use of stolen parts. Indeed, sometimes stolen parts were used on the very same cars from which they were stolen. Najjar and his cohorts would sell the reassembled cars at a dealership known as Clinton Auto Sales and later at Tri-City.

Tri-City was a corporation formed in November, 1997 after Najjar became aware of the Maryland State Police investigations into his operations and administrative efforts by the Maryland Motor Vehicle Administration to revoke his used car dealer's license. Najjar and his family formed Tri-City Auto Outlet by Najjar selling some of Clinton's assets to his brother Saleh. The formation of Tri-City was to protect Najjar's assets. Tri-City employed Najjar as its general sales and operations manager. Because Tri-City did not have a Motor Vehicle Administration license, it acted through Clinton and Najjar. Najjar sold nine fraudulently titled cars to Tri-City.

In 1995, Corporal Joseph Brown obtained search warrants for Clinton Auto Sales. Pursuant to the warrants, the police seized motor vehicles, parts, and documents, among other things. However, on April 22, 1996, a Maryland judge suppressed the evidence as obtained during an illegal search.

Brown and Lieutenant Steven Wright of the Maryland State Police spoke to each other later in 1995 regarding Maryland State Police Officer Michael White's interference in the investigation of Najjar. Lt. Wright began what he termed an administrative investigation against White, receiving 20 salvage certificates, confidential law enforcement records, and FBI National Crime Information Center files obtained during the search of Clinton Auto Sales. These documents were printed by White at the Leonardstown State Police Barracks and given to Najjar.

Wright continued his investigation, eventually expanding it into a criminal investigation against Najjar. From November, 1995 to March, 1997, Wright amassed substantial information implicating Najjar in a car theft and chop shop ring eventually including information on over 500 cars sold by Clinton Auto Sales. In 1997, Wright applied for a search warrant for the Clinton premises based on this information. The warrant issued. Later, Wright obtained warrants for two warehouses used by Clinton Auto Sales.

In November, 1998, Wright sought search warrants for two businesses, Lee's Autobody and Frame, located in Virginia, and Perdue's Used Cars, where Najjar had moved his operations. Wright's information led to the issuance of two federal search warrants. On the basis of this information, a federal grand jury indicted Najjar.

In 1998, the district court entered a restraining order against Clinton Auto Sales, Najjar, and Tri-City, preventing the sale of certain vehicles. Tri-City intervened to modify or remove the restraints. The district court ruled that its order did not apply to vehicles titled to Clinton which had been transferred to Tri-City. This included some $500,000 in inventory. The government sought to add Tri-City to the criminal case, and a grand jury indicted Tri-City on nine counts. This resulted in another restraining order which froze the previously excluded assets. Tri-City alleges that its indictment was a result of prosecutorial vindictiveness for Tri-City's bona fide attempts to protect its assets. The district court denied Tri-City's contention finding that it had failed to establish "actual vindictiveness."

During trial, Najjar contended that the information obtained from the 1997 and 1998 search warrants should be suppressed because the information supporting probable cause in the warrant applications derived from the 1995 illegal search. The district court examined the affidavits, excluding all information obtained in 1995 in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978), and *Brown v. Illinois*, 422 U.S. 590 (1975), and concluded that probable cause was present.

Najjar also sought severance or mistrial based on *Bruton v. United States*, 391 U.S. 123 (1968). Lt. Wright testified to out of court statements made by White and Downing, Maryland State Police Officers and co-defendants of Najjar's, and produced a tape recording of an

interview with Downing. The district court redacted portions of the statements incriminating Najjar and gave a limiting instruction to the jury that the statements were admissible only as to Downing and White.

Najjar and the other defendants moved for acquittal on the mail fraud counts arguing that certificates of title did not constitute property. The district court denied the motions and submitted the case to the jury with a special verdict form requiring the jurors to specify which objectives of the mail fraud scheme the government had proven, if any. On five counts, the jury found that at least one of the objectives was to deprive Maryland of honest services and property. In addition to the several mail fraud counts, Najjar and Tri-City were convicted of money laundering and RICO violations.

After the guilty verdicts had been rendered against Najjar and Tri-City, the Supreme Court decided *Cleveland v. United States*, 531 U.S. 12 (2000), which held that a scheme to defraud Louisiana of gambling licenses did not deprive the state of "property" within the meaning of 18 U.S.C. § 1341. The court reasoned that a license is purely a regulatory matter and therefore implicated its role as a sovereign, not its role as a property holder. 531 U.S. at 26-27.

After trial, the district court conducted RICO forfeiture proceedings. In the RICO forfeiture proceedings, the district court applied a preponderance of the evidence standard. The defendants argue that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a reasonable doubt standard. Furthermore, they allege that the district court erred when it declined to provide a definition of reasonable doubt in its jury instructions.

## II.   NAJJAR'S CLAIMS

### A.   *Severance or Mistrial*

#### 1.   Inconsistent Defenses

Najjar first contends that the district court abused its discretion when it refused to grant Najjar's several severance and alternative

mistrial motions. Federal Rule of Criminal Procedure 14 provides for joinder of defendants when they are alleged to have participated in the same act or series of acts constituting an offense. Rule 14. There is no doubt that Najjar was properly joined as a defendant with officers White and Downing, and Tri-City Auto Outlet in this case. However, Najjar maintains that the district court should have granted him severance under Federal Rule of Criminal Procedure 14 before trial, during trial, or granted him a mistrial for failure to grant any of his several severance motions. We review the district court's rulings on severance and mistrial claims for abuse of discretion, *United States v. West*, 877 F.2d 281, 287-88 (4th Cir. 1989), and factual findings made in conjunction with these claims for clear error, *United States v. Smith*, 44 F.3d 1259, 1269 (4th Cir. 1995).

The Supreme Court has indicated that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Accordingly, severance under Rule 14 is only warranted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The defendant must "establish that actual prejudice would result from a joint trial, . . . and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995).

Najjar contends that the district court erred when it denied his motion to sever pre-trial. Najjar argued that the there would be evidence admitted against his co-defendants that would be inadmissible against him, and the spillover effect of the evidence would prejudice him. The district court found that Najjar had not articulated a theory that qualified as an irreconcilable defense sufficient to warrant severance at that time. Najjar's contentions appeared purely speculative to the district court and we cannot say on the basis of the record before us that the district court abused its discretion in denying Najjar's motion to sever. See *United States v. Becker*, 585 F.2d 703, 707 (4th Cir. 1978) ("Speculative allegations as to possible prejudice do not meet the burden of showing an abuse of discretion in denying a motion for severance.").

Najjar offers two bases for severance once the trial had commenced. First, Najjar states that his co-defendants pressed antagonistic and irreconcilable defenses resulting in an unfair trial. Secondly, Najjar claims that his joint trial violated his trial rights under *Bruton v. United States*, 391 U.S. 123 (1968). We will address each of these claims in turn.

Najjar points to several instances in the record where counsel for co-defendants White and Downing attacked his credibility or otherwise blamed the whole criminal enterprise on Najjar. These instances, so the argument goes, demonstrate that Najjar was deprived of a fair trial because the jury was "confronted with the dilemma of either choosing to believe Najjar or White and Downing." For instance, Najjar identifies this question posed by White's counsel on cross-examination of Najjar as the prime example of the conflicting defenses: "Mr. Najjar, it serves your purpose to say that these vehicles were not ready when the salvage certificate was signed, doesn't it? It would serve your purposes because you can't explain in any legitimate way how you could have a vehicle put together in three days."

There does appear to be some conflict in the presentation of defenses. The presence of conflicting or antagonistic defenses alone does not require severance, however. See *Zafiro*, 506 U.S. at 538. We note that "[t]he mere presence of hostility among defendants . . . or a desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials." *United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986) (internal quotations marks and citation omitted). The rule requires more than finger pointing. There must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, see *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir. 1984), or "that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Becker*, 585 F.2d at 707.

We are presented with no such situation here. Co-defendant's counsel indeed attempted to focus the jury's attention on Najjar during cross-examination; however, this attention came only after Najjar testified that White and Downing came to Clinton and signed salvage certificates before the cars had been rebuilt. This testimony not only

implicated Najjar, but White and Downing on the honest services prong of mail fraud. See 18 U.S.C. § 1341, 1346. Once Najjar elected to testify, he was rightly subject to vigorous cross-examination by the government and his co-defendants. As noted, "[t]he party moving for severance must establish that actual prejudice would result from a joint trial, . . . and not merely that a separate trial would offer a better chance of acquittal," *United States v. Reavis*, 48 F.3d at 767 (citation and internal quotation marks omitted). Perhaps Najjar would have fared better had his co-defendants not been there to cross-examine him. However, absent other circumstances not present here, we decline to adopt a rule that would allow a defendant to testify and then immunize himself from the consequences of that choice by limiting the ability of his co-defendants to test the veracity of that testimony, especially when that testimony implicates them.

We are of opinion that the content of the cross-examination does not rise above mere finger pointing, which does not provide the stark conflict necessary for relief. Counsel's statement focused on Najjar's part in the criminal enterprise. It did not, however, present a situation where Najjar's guilt was dictated by the asserted innocence of the co-defendants. Najjar's testimony implicated himself on the honest services prong of mail fraud. If, as counsel suggested, Najjar's testimony was self-serving, and the jury discredited Najjar's testimony, rather than dictate guilt, counsel's tactic actually tended to exonerate Najjar as to that particular count.

To the extent there was any actual prejudice suffered by Najjar by any conflict in the defenses, we think that the district judge cured such conflict by proper limiting instructions. See *Zafiro*, 506 U.S. at 540-1 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209 (1987) ("[J]uries are presumed to follow their instructions."). Therefore, we are of opinion that the district court did not abuse its discretion in denying Najjar's motions to sever or grant him a mistrial for failure to do so.

### 2. *Bruton*

Najjar also claims that the district court abused its discretion for failure to sever or grant a mistrial based on the admission of out of court statements made by White and Downing that allegedly incrimi-

nated Najjar in violation of *Bruton v. United States*, 391 U.S. 123 (1968). A *Bruton* problem exists only where a co-defendant's statement on its face implicates the defendant. *United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994). The admitted statements were redacted by the trial judge to eliminate any facial incrimination of Najjar. In fact, Najjar does not identify any facially incriminating statement. Additionally, the district court told the jury that the statements were admissible only as to White and Downing and not to any other defendant. Under these circumstances, we are of opinion that the district court did not abuse its discretion in denying Najjar's motion to sever or grant a mistrial based on *Bruton*.

### 3.   Denial of instruction regarding Co-defendant's failure to testify

Najjar argues that the district court erred in not allowing Najjar to comment on his co-defendant's failure to testify. It is axiomatic that a defendant's failure to testify cannot be used to draw an inference of guilt. Similarly, a co-defendant's failure to testify cannot be used to draw an inference of innocence on behalf of the complaining defendant. See *United States v. Marquez*, 449 F.2d 89, 93 (2d Cir. 1971). Thus, the district court did not abuse its discretion in denying Najjar's motion.

### B.   *Search Warrants*

Najjar's next claim is that the district court's denial of his motion to exclude evidence obtained through two search warrants secured in 1997 and 1998 was error and requires reversal of his convictions. In short, Najjar argues that much of the evidence used to obtain these warrants derived from the execution of a 1995 warrant issued by a Maryland court, later invalidated, and therefore, the 1997 and 1998 search warrants were illegally obtained. The nub of Najjar's argument is that the district court "erred in not considering and finding that the illegally obtained evidence tended significantly to direct the investigation to the evidence in question." Appellant's Br. at 53. We review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998) (citation omitted).

This issue requires a recitation of the relevant facts surrounding the application and issuance of the search warrants. In 1995, Officer Brown of the Prince Georges County Police Department obtained two search warrants for the premises of Clinton Auto Sales based upon a previous warrantless entry. Upon execution of the warrants, the police seized motor vehicles, parts, a firearm, and documents including salvage certificates pertaining to cars sold by Clinton Auto Sales. Officer Brown noticed that many of the seized salvage certificates were signed by Maryland State Police Officer Michael White. Brown complained to Maryland State Police Officer Wright that White was impeding Brown's investigation. To support his charge, Brown showed Wright 20 of the salvage certificates obtained in the search of Clinton Auto Sales. Brown also provided Wright with confidential law enforcement records from the Maryland Interagency Law Enforcement System and the FBI's National Crime Information Center, all of which were seized from Clinton Auto Sales and printed at the Maryland State Police Leonardstown barracks by Officer White. Brown and his supervisor eventually provided Wright with two boxes of documents, including 70 other salvage certificates, and a Rolodex seized from Clinton Auto Sales. Additionally, Officer Brown summarized information Jessica Ellis, a former girlfriend of Najjar's, provided to him in order to secure the 1995 search warrants. On the basis of this information, Wright initiated "an administrative investigation" of Officer White.

Wright began his investigation by reviewing records of White's activities regarding inspection and certification of Najjar's salvaged vehicles. Wright found that very few incident reports had been filed for White's inspections.[1] Wright then personally interviewed Jessica

---

[1]Under Maryland law, after a vehicle is declared salvage, the original certificate of title is returned to the MVA, which issues a salvage certificate. Once the vehicle is returned to safe operating condition, the owner must have the vehicle inspected by a duly trained and certified police officer. Md. Trans. Code § 13-506.

Salvage inspections are carried on by appointment at state police barracks. Officers are required to confirm the VIN at three different locations and search for evidence of theft or VIN tampering. Each inspection requires the officer to cause the barracks where the inspection occurred to issue a Complaint Control Card to document the inspection.

Ellis. Ellis described a Maryland State Police Officer who would visit Clinton Auto Sales late at night to sign salvage certificates without inspecting the vehicles. According to Ellis, the Officer received envelopes from Najjar and had been given a vehicle to use.

Because no records or incident reports were available from the state police barracks, Wright broadened his investigation by requesting vehicle records for all of Najjar's vehicle purchases from auction houses. These companies provided Wright with information regarding over 500 vehicles Najjar had purchased. In addition, Wright generated a list of insurers from the salvage certificates Brown provided him and requested investigative files from the insurer's special investigative units. Wright then requested certified histories for all of these vehicles from the Maryland Motor Vehicle Administration. These certified histories contained duplicates of all the salvage certificates Wright previously received from Officer Brown. Wright contacted the manufacturers of the salvaged vehicles to cross-reference part numbers of the specific vehicles with their unique vehicle identification numbers. From March to June 1996, Wright reviewed photographic surveillance conducted by Special Agent Gary Pontecorvo of the FBI, who had been investigating Clinton Auto Sales in a separate narcotics and money laundering investigation in 1993 and 1994. Some of the video tapes showed Officer White visiting Clinton Auto Sales with Najjar and Ellis present. Wright conducted his own surveillance including inspection of ten vehicles sold by Clinton Auto Sales.

In March, 1997, based on the information recounted above, Wright applied for a search warrant for Clinton Auto Sales premises. The warrant issued and a search was conducted. Two more search warrants issued for other garage bays Najjar owned. In 1998, federal search warrants issued for the premises of Perdue's Auto Sales and Lee's Autobody and Frame based on their association with Najjar, Clinton Auto Sales, and Tri-City. At trial, Najjar sought to suppress

Once a satisfactory inspection is complete, the officer signs the salvage certificate certifying that the vehicle is restored, inspected, and that the officer has certified the VIN. This salvage certificate allows the owner to retitle the vehicle. Finally, the officer submits an Incident Report describing the inspection, vehicle, and owner.

all of the evidence obtained from these searches. The district court, following *Franks v. Delaware*, 438 U.S. 154 (1978), and *Brown v. Illinois*, 422 U.S. 590 (1975), denied the motion.

The basic rule for whether evidence derived from an illegal search should be suppressed comes from the Supreme Court's pronouncement in *Wong Sun v. United States*: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. 471, 487-8 (1963) (citation omitted). Najjar's argument on appeal is essentially that every investigative step taken by White had its wellspring in the salvage certificates and other evidence seized from Clinton Auto Sales in the unlawful 1995 search, and therefore, the later searches were directly linked to the primary illegality.

Generally, evidence derived from an illegal search or arrest is deemed fruit of the poisonous tree and is inadmissible. See *Wong Sun v. United States*, 371 U.S. at 484-485. However, not all evidence conceivably derived from an illegal search need be suppressed if it is somehow attenuated enough from the violation to dissipate the taint. In *United States v. Ceccolini*, 435 U.S. 268 (1978), the Supreme Court stated:

> Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a "per se or 'but for' rule" that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with [a Fourth Amendment violation].

435 U.S. at 276 (citation omitted). That is to say, a direct, unbroken chain of causation is necessary, but not sufficient to render derivative evidence inadmissable. To determine whether the fruit is no longer poisonous, we consider several factors, including: 1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. See *United States v. Seidman*, 156 F.3d at 548 (citing *Brown v. Illinois*, 422 U.S. 590, 603-4 (1975)). What suffices to dissipate the taint from derivative evidence depends

on the specific facts and circumstances of each case, cf. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-9 (1973), and therefore, is particularly amenable to resolution by the district court.

We begin with the physical evidence. The original illegality occurred in 1995 when the Prince George's County Police Department sought "a search warrant based upon information gained during warrantless entries." JA 629. Applying the first *Brown* factor, the district court stated, "[t]he search warrant in this case is two years . . . later . . . a significant period of time in Fourth Amendment lore, I suggest." JA 629.

The first factor, time elapsed between the initial illegality and acquisition of evidence, cannot be evaluated in isolation of the other factors, at least with respect to physical evidence. The temporal proximity of the primary illegality to the second search does not, after some identifiable point on a time line, magically dissipate the taint on subsequently obtained *physical* evidence. In other words, the mere passage of time cannot serve to make tainted physical evidence admissible.[2] Rather, the temporal aspect can inform the attenuation analysis, for instance, by providing a context to the government's further investigations.

---

[2]*Brown* involved an illegal arrest and subsequent confession after the giving of a *Miranda* warning. In posing the issue to be addressed, the Court made it clear that the focus of the inquiry was directed at determining whether the accused himself had purged that taint by acting of his own accord:

> In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be sufficiently an act of free will to purge the primary taint.

*Brown*, 422 U.S. at 602 (internal quotation marks and citation omitted). Thus, the temporal factor in *Brown* served as evidence of the exercise of free will on the part of the accused in giving a confession subsequent to an illegal arrest. See also *Oregon v. Elstad*, 470 U.S. 298, 310-11 (1985); *United States v. Ceccolini*, 435 U.S. 268, 279 (1978).

Here, we must recognize that very little time elapsed between the primary illegality and Wright's new investigation, perhaps a period of weeks. Wright began to use this material immediately and worked diligently to amass more information on White's role in Najjar's enterprise. However, Wright's investigation continued for more than two years; this amount of time was necessitated by the fact that White had not filed incident reports or other documents normally completed for salvage certificates. This absence of records at the State Police barracks, in effect, ended the initial paper trail manifesting Officer White's potential involvement in the criminal enterprise. In this connection, the district court found:

> It is correct [that] Lieutenant Wright had specific cars and salvage certificates at hand and in mind when he made the original requests to the barracks, both with the original 20 and later 70. What happened, though, I find as a matter of fact, ended any direct use of those salvage certificates and those identifiable cars because the information that came back was that there were no [Complaint Control] log records or [Complaint Control] cards or incident reports so that it was not possible to trace from the salvage certificates themselves the activities of the person under investigation, that is, Officer White.

> What happened was that Lieutenant Wright stepped back, regrouped and started again with the auction houses, with the insurance companies and then with the MVA to track the activities of Clinton Auto Sales that obviously broadened his investigation . . . . [The salvage certificates] are records that exist in . . . several different locations at the same time. . . . The ones that are being used here were come about by an independent mechanism, one that was available to the police and would have been, regardless of what happened at Clinton Auto Sales in January of 1995.

These conclusions of fact are not clearly erroneous. The absence of records at the barracks obviously caused considerable difficulty to Wright's investigation, at least in part evidenced by the two-year duration of the investigation. In short, Wright's investigation was not a simple matter of looking at salvage certificates obtained in the 1995

search and obtaining new evidence from their use, rather it was a substantial investigative effort unconnected to the seized documents themselves once Wright encountered the impediment at the Maryland State Police Barracks. The result of this investigation was that the *public* records seized from Clinton Auto Sales were rediscovered from independent sources. Because the documents subsequently came into Wright's possession independently, they cannot be the result of the primary illegality. Najjar argues that the district court's conclusion here is wrong because "the illegally obtained evidence tended significantly to direct the investigation to the evidence in question." However, it is not enough that the original certificates may have triggered Wright's suspicion or gave "impetus or direction toward what is to be focused on by the government." *United States v. Smith*, 155 F.3d 1051, 1061 (9th Cir. 1998) (citation omitted). Even if the original illegal search in some slight way was a but-for cause of the later searches, Wright's two-year investigation and the intervening circumstances were sufficient to break the causal link between any primary illegality and later obtained evidence. Therefore, we are of opinion that the first and second factors weigh in favor of the government.

Finally, we note that the purpose of the misconduct was to obtain information to apply for a later, ostensibly legal search warrant. While a warrantless search used to justify a later warranted search, a violation that goes to the core of the Fourth Amendment, should be viewed with somewhat heightened suspicion, there is no reason to suppress the information gained here. As the district court concluded, and we agree, "there was no intent to deceive the judge who issued that first search warrant. All the information was given to that judge. . . . [I]t was not so flagrant and purposeful misconduct by Prince George's County Police to require any extra vigilance by this Court." J.A. 634-35.

Because the relevant factors identified in *Brown v. Illinois* favor the government, we are of opinion that Najjar's suppression motions as to the physical evidence were properly denied by the district court.

We now turn briefly to suppression of the statements of Jessica Ellis. The standards for suppression of witness testimony are stricter than for physical evidence: "[S]ince the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the

illegality and that kind of testimony is required." *United States v. Ceccolini*, 435 U.S. at 278. No such link exists here. The district court found that Jessica Ellis contacted the authorities herself, and as this contact was a product of her own free will, it cannot be tainted. Therefore, there is no basis to suppress her testimony.

## C.  *Probable Cause*

Najjar claims that the 1997 and 1998 search warrants were not supported by probable cause. Probable cause exists if the facts presented would "'warrant a man of reasonable caution' to believe that evidence of a crime will be found." *United States v. Williams*, 974 F.3d 480, 481 (4th Cir. 1992). As the discussion above demonstrates, Wright developed extensive evidence of the commission of crimes by Najjar. Therefore, we are of opinion that the issuing magistrate had "a substantial basis . . . for conclud[ing] that a search would uncover evidence of wrongdoing" and thus the warrants were supported by probable cause. *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (internal quotation marks and citation omitted).

## D.  *Mail Fraud*

Najjar next contends that four of his mail fraud convictions must be reversed because his actions do not fit the statutory definition of the crime. Specifically, Najjar was found guilty of defrauding the Maryland Motor Vehicle Administration of property under 18 U.S.C. § 1341, and Najjar claims that motor vehicle titles do not qualify as property under the statute after *Cleveland v. United States*, 531 U.S. 12 (2000). Najjar states that this case requires the reversal of its convictions for mail fraud where the jury specified the deprivation of property as an object of the scheme.

The jury, by special verdict found Najjar guilty on six mail fraud counts.[3] On the first, unchallenged here, it found the sole objective

---

[3]A general verdict in a multiple object conspiracy should "be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957). Special verdicts obviate this problem by allowing a court to determine upon what factual and legal basis the jury decided a given question. Because the district court employed special verdict forms, no *Yates* problem presents itself.

was to defraud customers. On counts two through four, the jury concluded that all three charged objectives were proven: defrauding customers, defrauding the State of property in the form of licenses, and depriving the State of honest services. Finally, on counts five and 10, the jury found proven the objective of depriving the State of honest services. Assuming, without deciding, that *Cleveland* removes certificates of title as a species of property cognizable under the mail fraud statute, we nevertheless affirm Najjar's mail fraud convictions because they rest on at least one valid theory of liability specifically found by the jury and thus any error was harmless.[4]

## III.   TRI-CITY'S CLAIMS

### A.   *Prosecutorial Vindictiveness*

Tri-City argues that the sole reason it was added to the indictment was in retaliation for the exercise of its right to protect its assets during pre-trial forfeiture proceedings against Clinton Auto Sales and Najjar and thus stemmed from prosecutorial vindictiveness. The district court found that Tri-City did not establish a presumption of vindictiveness and that it also failed to show actual vindictiveness. We review the district court's decision for abuse of discretion and find no error. See *United States v. Fiel*, 35 F.3d 997, 1007 (4th Cir. 1994).

A defendant ". . . may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Although the Court has presumed an improper vindictive motive on the part of a prosecutor where the detrimental action was taken against the defendant immediately following the exercise of that right, such a presumption applies "only in cases in which a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 372 (1982). Tri-City's participation in the pre-trial forfeiture proceedings alerted the prosecutors to the possibility that forfeitable assets could be dissipated through Tri-City. Furthermore, Najjar's role in Tri-City made Tri-City itself a legitimate target for prosecution.

---

[4]In *McNally v. United States*, 483 US. 350 (1987), the Supreme Court held that depriving a State of intangible rights did not meet the requirements of 18 U.S.C. § 1341. However, Congress amended § 1341 to protect "the intangible right of honest services." 18 U.S.C. § 1346.

We have said that "[a] prosecutor is not bound by his initial assess-ment of the case embodied in the original charges. . . . Prosecutors are free to reexamine the appropriate level of prosecution before trial . . . ." *United States v. Williams*, 47 F.3d 658, 664-5 (4th Cir. 1995). That the new information resulting in the superceding indictment came from Tri-City's attempt to protect assets is immaterial. Accord-ingly, there is no reasonable likelihood of vindictiveness and no pre-sumption arises. Furthermore, Tri-City has made no competent showing of actual vindictiveness.

### B.  *Sufficiency of the Evidence*

Tri-City was convicted of money laundering, possession of motor vehicle parts with obliterated vehicle identification numbers, remov-ing identification for motor vehicles, obstruction of justice, owning, operating, maintaining, or controlling a chop shop, and a RICO offense. Tri-City argues that its convictions are not supported by suf-ficient evidence and this requires reversal. The verdict of a jury, how-ever, must be sustained if there is substantial evidence, taking the view most favorable to the government to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

We will begin our analysis with Tri-City's money laundering con-viction.

### 1.  Count 15: Money Laundering

Tri-City was indicted for knowingly engaging in a monetary trans-action in excess of $10,000 in property derived from Najjar's fraudu-lent activity. The indictment alleged that the laundering stemmed from Najjar's sale of fraudulently titled automobiles to Tri-City. Tri-City argues that "[t]he deficiency in the government's case on this Count is that there is no evidence that anyone acting *on behalf of the corporation* knowingly participated in a money laundering scheme under § 1957." (emphasis in original).

Money laundering under 18 U.S.C. § 1957 is "a monetary transac-tion in criminally derived property that is . . . derived from specified unlawful activity." 18 U.S.C. § 1957(a). Title 18 U.S.C. § 1957(f)(2)

defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." In order to support a conviction for money laundering, there must be proof beyond a reasonable doubt that the defendant knowingly participated in a monetary transaction involving criminally derived proceeds. With respect to the knowledge element, which we understand to be Tri-City's real challenge to its conviction, the case was presented to the jury as follows:

> [T]he Government must prove beyond a reasonable doubt . . . that the defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity. I instruct you that this element refers to a requirement that the defendant knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a criminal offense under state or federal law. I instruct you as a matter of law that mail fraud is a criminal offense.

> As I stated earlier, you may infer that the defendant had knowledge from circumstantial evidence or from evidence showing willful blindness by a defendant.

> . . . [T]he Government must prove beyond a reasonable doubt . . . that the defendant knowingly engaged in an unlawful monetary transaction . . . . [T]he Government is not required to prove that the defendant knew the particular offense from which the criminally derived property was derived. However, the Government must prove beyond a reasonable doubt that the defendant knew that the transaction involved criminally derived property, which I remind you means any property constituting or derived from proceeds obtained from a criminal offense. If you find that the Government has established beyond a reasonable doubt that the defendant knew that the transaction involved property derived from criminal offense, then this element is satisfied.

The defendants did not object to this instruction.

There is substantial evidence in the record that principals of Tri-City knew that the vehicles they purchased from Najjar were proceeds

of criminal activity. For example, the evidence established that Firyal Najjar, Tri-City's president, was also an employee of Clinton Auto Sales. Firyal Najjar worked at a desk directly across from Basem Najjar in an office filled with stolen car parts throughout the period of investigation. Additionally, the Purchase and Sale Agreement transferring the vehicles to Tri-City noted "the investigation by law enforcement officers dealings with the acquisition of certain parts and components of vehicles Maryland State Police investigation, currently pending." This agreement was signed by Firyal Najjar. Firyal Najjar was present during conversations between Jimmy Lee and Basem Najjar about the need to buy and strip a red Acura to create a legitimate excuse for their possession of another red Acura and its parts. During this conversation, Basem Najjar asked Lee to backdate receipts for other vehicle parts so that Najjar could forward them to his attorney. From this, and voluminous other evidence, a reasonable jury could have concluded that Tri-City knowingly participated in a money laundering transaction. Accordingly, we affirm Tri-City's conviction on this count.

We especially note that no issue as to the use of the mails is made here or was made at trial.

### 2.   Counts 16, 17, 18

The brief of Najjar and Tri-City tacitly admits the sufficiency of evidence to sustain the conviction of Najjar, with which admission we agree. The brief provides, p.78:

> While Basem Najjar, with the knowledge he was aware of and by his individual acts, may have taken steps to possess motor vehicle parts with obliterated serial numbers (18 U.S.C. § 2321), transport from Maryland to Virginia stolen property (18 U.S.C. § 2314), and/or remove identification from a motor vehicle (18 U.S.C. § 511(a)(1), the evidence is insufficient that Tri-City knew or should have known what Basem Najjar was doing and/or that Basem Najjar was acting within the scope of his employment and to somehow benefit Tri-City. The evidence to convict Tri-City on these three counts is insufficient.

So the contention here is that while "[a]n agent may be acting for himself and a corporation at the same time," it may not "criminally bind the corporation. It is precisely this evidence that is missing in this case." Br. p.78.

Tri-City's arguments fail, however, because Tri-City's convictions do not rest on Najjar's crimes committed prior to its incorporation. Najjar continued his criminal activities while employed at Tri-City and, due to the broad grant of authority in the employment agreement coupled with the overwhelming evidence, the jury could easily have found beyond a reasonable doubt that Najjar's conduct comprising criminal activity was within the scope of his authority as general sales manager and taken for the benefit of Tri-City.

Tri-City hired Najjar to be its general sales and operations manager "with responsibility for managing, directing and overseeing the daily sales operations of the Company, and all matters related to said operations." The agreement provided that "Najjar shall work exclusively for the Company and shall not engage in any professional or business activity which is not for the benefit of the Company." As part of his duties for Tri-City, Najjar bought and sold vehicles using his Motor Vehicle Administration used vehicle dealer's license. The jury was presented with evidence that no principal in Tri-City reprimanded Najjar or placed limits on his authority to act for Tri-City. Tri-City's conviction on count 16 was for possessing motor vehicle parts with obliterated identification numbers. Count 17 involved the interstate transportation of stolen vehicle parts. Count 18 involved removing the VIN from an automobile. Tri-City's convictions on counts 16-18 all deal with motor vehicle salvage and repair and thus the jury could have reasonably concluded that Najjar was acting within the scope of his authority as defined in the broad employment agreement when he undertook his actions.

### 3.   Counts 19, 20, 21

These counts deal with the obstruction of justice under 18 U.S.C. §§ 1503(a), 1512(b)(3) and 1523(b)(2)(B). They deal with the withholding of information, or presentation of false information, or concealment of information from law enforcement authorities or the grand jury.

Najjar does not contest the sufficiency of evidence to the finding of guilty on these counts. The claim of error is that "[t]he government failed to prove that Basem Najjar was acting for the benefit of the corporation and not solely in his sole interest."

The government points out, however, that corporations have frequently been convicted of obstruction of justice offenses and that there was ample evidence form which "the jury could conclude that as Najjar sought to protect himself, he also intended to protect Tri-City by concealing crimes he committed as Tri-City's manager and license holder." We agree with the position of the government and hold that although it may not have been proven that Najjar acted "solely in his sole interest," the fact that the record shows he was acting both in the interest of himself and the corporation is sufficient to support the conviction of Tri-City on these counts.

### 4.   Count 22: The Chop Shop Count

On the chop shop count, the jury was presented with ample evidence of Tri-City's involvement through Najjar. Tri-City's premises were the same as Clinton Auto Sales' and they shared employees. There was testimony from George Perdue that he visited Tri-City numerous times in 1998 and it was "full of cars and parts . . . a lot of high dollar parts and cars . . . so much stuff lying around." Further, there was testimony establishing that Tri-City's premises were used for the storage, stripping, and rebuilding of stolen cars. For example, Roger Baylor testified that he and Najjar picked up the front clip from a red sports car and transported it back to Tri-City. Wright's search of Perdue's uncovered the front clip from a stolen red Acura NSX, which was being installed on a yellow Acura NSX salvage vehicle. After the search of Perdue's, Najjar arranged for Baylor to move stolen parts from the red NSX stored at Tri-City and his home to Lee's. A conversation between Jimmy Lee and Najjar recorded in November 1998 detailed Najjar's plan to buy an additional red Acura NSX, cut it up, remove its VIN, and create backdated receipts to cover for the government's discovery of the stolen parts. Najjar intended to forward these receipts to his attorney who would then forward them on to the government. This conversation took place at Tri-City Auto Outlet. From this evidence, and that contained in the volu-

minous record, the jury could easily have found Tri-City guilty of running a chop shop.

### 5.  Count 23: RICO

The government charged Tri-City and Najjar with a violation of RICO in the indictment as follows:

> At all times material to this Indictment, defendant BASEM NAJJAR, CLINTON AUTO SALES (a sole proprietorship which employed numerous individuals other than defendant BASEM NAJJAR), defendant TRI-CITY and other persons known and unknown and to the Grand Jury, were an association in fact and constituted an enterprise as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact, which was engaged in and the activities of which affected interstate and foreign commerce.

Tri-City, however, attacks the RICO[5] conviction by arguing that the government failed to prove the existence of an "enterprise" and a "pattern of racketeering activity." On the latter element, Tri-City argues that there was no common purpose between Najjar and Tri-City, and further that there was no structure to the enterprise, only Najjar's separate interests. Specifically, Tri-City complains that it is improper to put "two hats" on Najjar, one as an employee of Tri-City, and the other as an individual, in order to show an enterprise and common purpose. We find Tri-City's arguments here to be without merit and affirm the conviction.

First, principles of corporate liability apply in the RICO context.

---

[5]18 U.S.C. § 1962 provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

An enterprise in the context of RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); cf. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001). The Supreme Court has stated in this context, "[w]hether the Act seeks to prevent a person from victimizing, say, a small business . . . or to prevent a person from using a corporation for criminal purposes . . . the person and the victim, or the person and the tool, are different entities, not the same." *Cedric Kushner Promotions*, 533 U.S. at 162. A certain degree of "distinctness" is required for RICO liability; however, where a corporate employee "acting within the scope of his authority . . . conducts the corporation's affairs in a RICO-forbidden way," the only "separateness" required is that the corporate owner/employee be a natural person and so legally distinct from the corporation itself. *Cedric Kushner*, 533 U.S. at 163. Thus, there were two distinct entities in this case sufficient for liability under 18 U.S.C. § 1962(c): (1) a person, Basem Najjar, and (2) a corporation, Tri-City Auto Outlet, Inc.

For the same reason, Tri-City's argument, that the common purpose prong was not proven, fails. Najjar, as we have discussed above, was not acting solely on his own behalf, but on behalf of, and with and intent to benefit, Tri-City Auto Outlet. Both Najjar and Tri-City, through Najjar's agency, sought to further the illegal scheme and so had the requisite common purpose. Furthermore, there was evidence that tended to show at least one other member of Najjar's family, the President of Tri-City, Firyal Najjar, Basem's mother, had knowledge of Najjar's illicit activities and did not seek to halt it. Accordingly, we are of opinion that the jury could reasonably have concluded that Tri-City was guilty of a RICO violation beyond a reasonable doubt.

## IV. JOINT CLAIMS

### A. *Forfeiture*

Tri-City and Najjar were required to forfeit their interests in more than $2.7 million and this amount represented all of Tri-City's assets. RICO requires the forfeiture of all ill-gotten gains derived from racketeering activities and the $2.7 million forfeiture judgment was based on the fact that all of Tri-City's activities taken through Najjar were

tainted by the charged illegality.[6] See 18 U.S.C. § 1963(a).[7] The defendants challenge the district court's forfeiture decision on two grounds. First, the defendants argue that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), requires a court to use a reasonable doubt standard in a forfeiture proceeding. Had the district court applied this standard, so the argument goes, the evidence presented would not have been sufficient for a reasonable trier of fact to conclude that forfeiture was warranted. Second, the defendants allege that the forfeiture imposed an unconstitutionally excessive fine in violation of the Eighth Amendment.

In *United States v. Alexander*, the Supreme Court found that forfeiture under RICO is a part of the punishment for the substantive offense of racketeering. 509 U.S. 544, 558 (1993) ("The *in personam* criminal forfeiture at issue here is clearly a form of monetary punishment. . . ."). Furthermore, the Supreme Court has stated that district

---

[6]The district court's findings as to Najjar were incorporated in its judgment against Tri-City.

[7]The RICO penalty provisions require the convicted to forfeit to the United States any property or interest of any kind in

> (1)   any interest the person has acquired or maintained in violation of section 1962;
>
> (2)   any -
>
> > (A)   interest in;
> >
> > (B)   security of;
> >
> > (C)   claim against; or
> >
> > (D)   property or contractual right of any kind affording a source of influence over;
>
> any enterprise which the person established operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and
>
> (3)   any property constituting, or derived from, any proceeds which the person obtained, directly, or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

18 U.S.C. § 1963(a).

courts may make factual determinations bearing on punishment by a preponderance of the evidence. See *United States v. Watts*, 519 U.S. 148, 156 (1997) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986)). Nothing in *Apprendi* overrules *Alexander* or *Watts*, and until the Court does so, we follow them. Furthermore, because RICO forfeitures are part of the punishment, and thus part of the sentencing determination, there was no fact passed on by the trial judge but not charged in the indictment that would have increased the penalty the defendants faced beyond the statutory maximum penalty. See *Apprendi v. New Jersey*, 530 U.S. at 490. Therefore, the district court did not err in applying a preponderance of the evidence standard. Moreover, upon our independent review of the record, we are satisfied that that standard was amply met here.

As for Tri-City's excessive fines argument, we are similarly unimpressed. In *United States v. Bajakajian*, the Supreme Court held that a fine is excessive if "it is grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). There, the defendant had failed to report the export of $357,144. 524 U.S. at 337. Punishment under 18 U.S.C. § 982(a)(1) required forfeiture of the entire amount involved in the offense. The Supreme Court found that such a forfeiture was excessive because the defendant's crime was "solely a reporting offense," "and his violation was unrelated to any other unlawful activities." 524 U.S. at 337-38. Furthermore, although the statutory maximum sentence was five years or a $250,000 fine, either or both, under the Sentencing Guidelines, the defendant was subject to only six months in prison and a $5000 fine. 524 U.S. at 338.

The instant situation is clearly distinguishable. The district court stated that "by far the wealth of the work that passed through Clinton Auto Sales and Tri-City constituted the fruits of the mail fraud," and "that huge numbers of automobiles were restored to salable conditions by use of the fruits of theft." Furthermore, the district court found that "all of the property becomes tainted by [the] racketeering activity once it got well underway." From our review of the record, these findings are sound and are not clearly erroneous.

It also appears that the crimes for which Tri-City was convicted were much more serious than those in *Bajakajian*. Tri-City was

exposed to a $500,000 fine under the statute and what has been called a death penalty fine under § 8C1.1 of the Sentencing Guidelines. See United States Sentencing Guidelines § 8C1.1. It is clear that Tri-City was conceived in crime and performed little or no legitimate business activity, and as such, the forfeiture of all of its assets is not excessive under *Bajakajian*'s "grossly disproportional" standard.

## B.  *Instruction*

Lastly, the defendants state that the district court erred in not giving a jury instruction defining reasonable doubt. We have held that it is improper for a district court to define reasonable doubt for a jury unless the jury itself requests a definition. See *United States v. Oriakhi*, 57 F.3d 1290, 1300 (4th Cir. 1995). There was no jury request here, and so, there is no basis to grant Tri-City or Najjar relief on this account.[8]

The defendants' convictions and forfeiture judgments are accordingly

*AFFIRMED*.

---

[8]Tri-City and Najjar request that we reconsider the holding in *United States v. Oriakhi*. However, it is not within the power of a panel of this Court to overrule or reconsider a precedent set by another panel. See *Mentavlos v. Anderson*, 249 F.3d 301, 312 n.4 (4th Cir. 2001). Therefore, we decline Tri-City and Najjar's invitation.