**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4163**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

NAYNA TAYLOR, a/k/a Nanya Taylor,

Defendant – Appellant.

**No. 18-4169**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

EDWARD TAYLOR, a/k/a Edward Giles Taylor,

Defendant – Appellant.

**No. 18-4342**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JASON BRADLEY, a/k/a Jason Edward Bradley,

        Defendant – Appellant.

---

Appeals from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:16-cr-50008-NKM-6; 3:16-cr-50008-NKM-7; 3:16-cr-50008-NKM-1)

---

Argued: May 9, 2019                                      Decided: August 19, 2019

---

Before WILKINSON and KING, Circuit Judges, and Irene C. BERGER, United States District Judge for the Southern District of West Virginia, sitting by designation.

---

Vacated and remanded by unpublished opinion. Judge King wrote the majority opinion, in which Judge Berger joined. Judge Wilkinson wrote a dissenting opinion.

---

**ARGUED:** Paul Andrew Tharp, ARNOLD & SMITH, PLLC, Charlotte, North Carolina; William Robinson Heroy, GOODMAN, CARR PLLC, Charlotte, North Carolina; Jeffrey Michael Brandt, ROBINSON & BRANDT, P.S.C., Covington, Kentucky, for Appellants. Jean Barrett Hudson, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Matthew M. Robinson, ROBINSON & BRANDT, P.S.C., Covington, Kentucky, for Appellant Jason Bradley. Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

KING, Circuit Judge:

Following a three-week jury trial in the Western District of Virginia, appellants Nayna Taylor, Edward Taylor, and Jason Bradley (collectively, the "defendants") were convicted of conspiracy offenses related to a scheme — wide-ranging both temporally and geographically — to distribute synthetic drugs commonly known as "bath salts." Although the defendants contested venue throughout the proceedings, the district court failed to submit any venue issues to the jury. In their consolidated appeals, the defendants challenge their convictions and resulting sentences on numerous grounds, including improper venue. As explained below, because the court committed reversible error by withholding the venue issues from the jury, we vacate the criminal judgments and remand.

I.

A.

The operative Superseding Indictment of July 19, 2016 (the "Indictment"), alleges in Count One that, from approximately March 2011 to October 2015, in the Western District of Virginia and elsewhere, the defendants participated in a conspiracy to distribute and to possess with the intent to distribute the synthetic drugs 3,4-methylenedioxypyrovalerone ("MDPV") and a-Pyrrolidinovalerophenone ("a-PVP"). The Indictment characterizes MDPV and a-PVP as controlled substance analogues until their listings on the federal controlled substance schedules, which occurred for MDPV on October 21, 2011, and for a-PVP on March 7, 2014.

3

Each of the defendants was charged in Count One with a drug trafficking conspiracy, in contravention of 21 U.S.C. § 846. Additionally, defendant Jason Bradley was charged in Count Two with a conspiracy to import one or more controlled substances, in violation of 21 U.S.C. § 963, and in Counts Three and Four with conspiracies to commit promotion money laundering and international money laundering, in contravention of 18 U.S.C. § 1956(h). The Indictment alleges that the Count Two, Three, and Four conspiracies — like the Count One conspiracy — transpired from approximately March 2011 to October 2015, in the Western District of Virginia and elsewhere. Eight additional conspirators were charged or are otherwise referenced in the Indictment, including a "Conspirator A" and a "Conspirator C" who allegedly distributed MDPV and a-PVP to a subdistributor in the Western District of Virginia dubbed "Conspirator B." Among the various indictees, only the defendants — Nayna Taylor, her husband Edward Taylor, and Bradley — opted to proceed to trial.

B.

At trial in Charlottesville, Virginia, in June and July of 2017, the government presented evidence of a more than four-year operation wherein suppliers shipped synthetic drugs from China to distributors headquartered, at various times, in and near Chicago, Illinois; Cincinnati and Columbus, Ohio; and Atlanta, Georgia. The initial shipments were of MDPV, but the supplies switched to a-PVP in late 2011, around the time that MDPV was listed on the federal controlled substance schedules. The distributors sold the MDPV and a-PVP to a multitude of subdistributors throughout the United States. Proceeds from the sales to the subdistributors were used to import

4

additional MDPV and a-PVP from China and carry on the drug trafficking activity. Under the government's evidence, the suppliers were defendant Jason Bradley and his then-wife Deborah Ryba. The distributors included Ryba's cousin Dave Scholz (the Indictment's "Conspirator A") and Scholz's associate Robert Schroeder ("Conspirator C"). And the subdistributors included defendants Nayna and Edward Taylor in Charlotte, North Carolina, and Chris Kaestner ("Conspirator B") in Harrisonburg, Virginia. Upon being caught selling a-PVP in mid-June 2013, Kaestner had agreed to cooperate in a state investigation that led to these federal criminal proceedings.[1]

The government relies on evidence of Kaestner's role as a subdistributor of MDPV and a-PVP in Harrisonburg, within the Western District of Virginia, to establish proper venue for each of the conspiracy charges against the defendants. Specifically, the government points to Schroeder's trial testimony that he distributed MDPV and a-PVP to Kaestner on several occasions between 2011 and 2015, sometimes in bulk and sometimes divided into small containers, including packets with a "Crystaal Bubbly" label associated with the charged conspiracies. To corroborate Schroeder, the government presented records reflecting that Kaestner wired Schroeder money from Harrisonburg in May 2011 ($1000), July 2011 ($700), May 2012 ($1500), and early June 2013 ($2000). When Kaestner was caught selling a-PVP in Harrisonburg in mid-June 2013, that a-PVP

---

[1] Kaestner was neither prosecuted nor called as a witness in the defendants' trial. Schroeder pleaded guilty to an information and testified against the defendants in an effort to obtain a sentence reduction. Ryba was among the indictees who similarly entered guilty pleas prior to trial and then testified for the prosecution. Her cousin Scholz died before the return of the Indictment.

was in "Crystaal Bubbly" packets. Thereafter, in cooperation with investigators, Kaestner placed orders with Schroeder for a-PVP that was mailed in September and October 2015 to a Harrisonburg post office box controlled by a local drug task force. The second of those orders was placed during a recorded telephone call.

Critical to the government's theory that Kaestner and the defendants all participated in the same drug trafficking operation — and thus that venue was proper in the Western District of Virginia for each conspiracy charge — Schroeder testified that synthetic drugs he distributed to Kaestner were part of supplies shipped by Bradley and Ryba from China. The veracity of that testimony was called into question, however, by additional Schroeder testimony and other evidence. For example:

- Schroeder revealed that, in mid-2011, when he began distributing Bradley and Ryba's China MDPV, he had since 2010 been distributing MDPV obtained from Las Vegas, Nevada suppliers unconnected to the charged conspiracies;

- Schroeder also disclosed that Kaestner was already a Las Vegas MDPV customer when Schroeder began distributing the China MDPV;

- According to Schroeder, he concurrently distributed the Las Vegas MDPV and the China MDPV until "[p]robably late 2011," *see* J.A. 1297;[2]

- Schroeder stated that, during just the period from approximately late 2011 until late 2012, he was distributing synthetic drugs supplied "only" by Bradley and Ryba from China, *see id.* at 1310;

---

[2] Citations herein to "J.A. __" refer to the contents of the joint appendix filed by the parties in these appeals.

6

- Schroeder described an extensive "break," beginning in mid-2012 and ending in late 2014, in which Bradley and Ryba did not supply any synthetic drugs to Schroeder and his co-distributors, *see id.* at 1396-98, 1487;

- Schroeder testified that, by late 2012, all synthetic drugs supplied by Bradley and Ryba from China were "gone," *see id.* at 1487;

- It was in mid-June 2013 — in the midst of the break and soon after Kaestner wired Schroeder $2000 — that Kaestner was caught selling a-PVP in "Crystaal Bubbly" packets;

- Schroeder admitted that he may have used "Crystaal Bubbly" packets during the break to distribute a-PVP from suppliers other than Bradley and Ryba;

- Although Schroeder testified that a pre-July 2015 distribution to Nayna Taylor and the September and October 2015 shipments to Kaestner all came from the same batch of a-PVP supplied by Bradley and Ryba, Taylor's a-PVP and Kaestner's a-PVP had different chemical compositions; and

- Following Schroeder's arrest in these proceedings, he told others that he believed the prosecution wanted him "to go after Bradley" in exchange for less severe charges and sentencing relief, *see id.* at 1521-23.

Further questions raised by the evidence included which of the money wired by Kaestner to Schroeder between 2011 and 2013 was for the purchase of MDPV or a-PVP from any source, as Schroeder testified that he also sold Kaestner items such as Viagra and Xanax tablets, and Schroeder's September 2015 shipment to Kaestner contained not only a-PVP but also pills.

C.

In February 2017, prior to their trial, the defendants raised their venue objections in order to simply preserve those objections. The defendants explained that — although

7

"[i]t appears on the face of the Indictment that venue may be appropriate" — they anticipated that the trial evidence would be insufficient to prove proper venue in the Western District of Virginia. *See* J.A. 135 (Jason Bradley's written objection to venue, subsequently joined by Nayna and Edward Taylor). The district court conducted a hearing on the venue objections and, as requested by the defendants, reserved ruling on those objections pending trial. Thereafter, in June 2017, a week before the trial commenced, Nayna Taylor submitted a proposed venue instruction that stated: "The defendant has a right to be tried in the district where the offense was committed. The government bears the burden of proving venue by a preponderance of the evidence as to each individual count." *Id.* at 389.

In early July 2017, at the close of the government's case-in-chief, the defendants moved pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure for judgments of acquittal. As part of her request for Rule 29(a) relief, Nayna Taylor pressed her venue objection, contending that the trial evidence contradicted the proposition — critical to the government's theory that Chris Kaestner and the defendants all participated in the same drug trafficking operation — that synthetic drugs distributed by Robert Schroeder to Kaestner in the Western District of Virginia were part of supplies shipped by Bradley and Deborah Ryba from China. Taylor focused on the a-PVP that Kaestner was caught selling in June 2013 (when "Mr. Schroeder has indicated he's using different sources") and the a-PVP that Schroeder shipped Kaestner in September and October 2015 (with a chemical composition "completely inconsistent with what Mr. Schroeder testified to, which was that [a-PVP from Bradley and Ryba] was all mixed up into one bunch and

8

then distributed out [to subdistributors including Taylor and Kaestner]"). *See* J.A. 2543-44. According to Taylor, the evidence "call[ed] into question whether or not Virginia is really implicated in this conspiracy." *Id.* at 2543.

Without specifically discussing venue, Edward Taylor characterized his Rule 29(a) motion as being "akin to" that made by Nayna Taylor. *See* J.A. 2454. Bradley's arguments for Rule 29(a) relief expressly included the contention — like Nayna Taylor's — that evidence concerning the a-PVP sold by and distributed to Kaestner in 2013 and 2015 belied the government's venue theory that Bradley and Ryba were the source of that a-PVP. *See id.* at 2461 (explaining that the evidence indicated "[t]here were other sources at those times, [meaning that] venue is not proper here in the Western District of Virginia").

After hearing from the parties, however, the district court concluded that the venue-related evidence was "sufficient" to proceed with the trial. *See* J.A. 2546 (pronouncing in response to Nayna Taylor's Rule 29(a) motion that "I think there's sufficient evidence that Western Virginia is sufficient venue"); *id.* at 2467 (ruling on Bradley's motion that "there's sufficient circumstantial evidence to go forward"). At the subsequent close of all the evidence, the defendants renewed their Rule 29(a) motions, including their venue objections. For his part, Edward Taylor overtly contested venue, asserting that there was no "jurisdiction" in the Western District of Virginia for the conspiracy charge against him. *See id.* at 2974. The court again denied each defendant any relief and proceeded to instruct the jury.

9

The jury charge did not include Nayna Taylor's proposed instruction regarding the government's burden of proving proper venue by a preponderance of the evidence, and the record is not clear whether Taylor objected to that omission. Alluding to the venue issues, the district court instructed that the Indictment alleges offenses "committed in the Western District of Virginia and elsewhere," and that Harrisonburg is "within the Western District of Virginia." *See* J.A. 2991. But the court did not instruct the jury to find whether the government had proved proper venue as to any count against any defendant, and no such findings were prompted by the verdict forms. The jury quickly returned guilty verdicts on all counts as to all defendants.

In August and September 2017, the defendants filed post-trial motions under Rules 29(c) and 33 for judgments of acquittal or new trials, reasserting their venue objections. In arguments joined by Edward Taylor and Bradley, Nayna Taylor reiterated that the trial evidence — including the evidence of the a-PVP sold by Kaestner in 2013 and distributed to him by Schroeder in 2015 — fell "short of proving that Schroeder's relationship with Kaestner was . . . part of the charged conspiracy." *See* J.A. 3425-27. On that ground, Nayna and Edward Taylor contested venue as to the single Count One conspiracy charge against them, and Bradley challenged venue as to each of the Count One through Four conspiracy charges against him.

In December 2017, following a hearing where the venue objections were argued, the district court denied the defendants' post-trial motions. In a memorandum opinion explaining its decision, the court addressed the venue objections and ruled that the government "presented sufficient evidence for a jury to conclude that an overt act in

10

furtherance of the conspiracy occurred in the Western District of Virginia." *See United States v. Bradley*, No. 3:16-cr-50008, slip op. at 18 (W.D. Va. Dec. 21, 2017), ECF No. 623. The court described the government's evidence as being that Schroeder distributed MDPV and a-PVP to Kaestner in Harrisonburg "from the end of 2011 through 2015," and that such synthetic drugs had been supplied by Bradley and Ryba from China. *Id.* Additionally, the court credited the government with "present[ing] evidence that the Taylors were part of this same conspiracy." *Id.* at 19. With respect to the evidence that in 2013 when Kaestner was caught selling "Crystaal Bubbly" packets of a-PVP, it was in the midst of the extensive "break" in which Bradley and Ryba did not supply any synthetic drugs to Schroeder, the court reasoned that "[t]he jury was entitled to make the inference that these packets seized in 2013 were part of the sales made by the conspiracy in the end of 2012." *Id.* Meanwhile, the court failed to confront the evidence of the different chemical compositions of the a-PVP distributed by Schroeder in 2015 to Nayna Taylor and then to Kaestner. Moreover, although the court repeatedly observed that the evidence was sufficient for jury findings of proper venue, the court did not acknowledge or seek to justify that the venue issues were never submitted to the jury.

The district court entered its criminal judgments against the defendants in March and May 2018, sentencing Nayna Taylor to 48 months in prison on Count One, Edward Taylor to 15 months in prison on Count One, and Bradley to a total of 262 months on Counts One through Four (consecutive terms of 120 months each on Counts One and Two and 11 months each on Counts Three and Four). The defendants timely noted these appeals, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

11

## II.

Proper venue in a criminal prosecution is a right secured by the Constitution. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ."); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). When a criminal defendant faces multiple charges, "venue must be proper on each count." *See United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000). The government bears the burden of proving proper venue by a preponderance of the evidence. *Id.*

Venue is a matter "ordinarily decided by the jury," though proper venue may be waived by a failure to "challenge venue before trial if the asserted venue defect is apparent on the face of the indictment." *See United States v. Engle*, 676 F.3d 405, 412-13 (4th Cir. 2012) (internal quotation marks omitted). Importantly, where

> an indictment properly alleges venue, but the proof at trial fails to support the venue allegation, an objection to venue can be raised at the close of the evidence. If the defendant raises such an objection, the district court must instruct the jury if there is a genuine issue of material fact with regard to proper venue.

*Id.* at 413 (internal quotation marks omitted); *see also United States v. Ebersole*, 411 F.3d 517, 526 (4th Cir. 2005) (recognizing that "a claim of [venue-related] instructional error may alternatively be preserved by an objection in a directed verdict motion made pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, before the jury retires").

12

A trial court's failure to submit the question of proper venue to the jury will constitute error if "the jury was able to convict the defendant of the offense[] charged without an implicit finding that the acts used to establish venue had been proven." *See United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990). Nevertheless, "proof of venue may be so clear that failure to instruct on the issue is not reversible error." *Id.* That is, where the evidence of proper venue was "substantial and uncontroverted," the error in withholding the venue issue from the jury may be deemed harmless. *Id.* at 377. In decisions invoked by our *Martinez* decision, evidence that will excuse a court's failure to submit the venue question to the jury has been described as "ample," "strong," "overwhelming," and "not contradicted." *See United States v. Moeckly*, 769 F.2d 453, 462 (8th Cir. 1985); *United States v. Jenkins*, 510 F.2d 495, 498-99 (2d Cir. 1975); *see also United States v. Griley*, 814 F.2d 967, 974 (4th Cir. 1987) (citing *Jenkins*'s "overwhelming" evidence standard and concluding that failure to instruct jury constituted harmless error because evidence of proper venue was "compelling").

Even though the term "substantial" has been used to describe the evidence needed to satisfy each, different standards apply in deciding whether evidence, including venue evidence, is sufficient to overcome a Rule 29(a) motion for a judgment of acquittal and whether evidence is adequate to withhold a venue issue from the jury. With respect to the denial of a Rule 29 motion, our "substantial evidence" assessment involves "viewing the evidence in the light most favorable to the Government" and determining whether it is "'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt' [or of proper

13

venue by a preponderance of the evidence].” *See United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)).  By contrast, with respect to the failure to submit a venue issue to the jury, we place the burden on the government to show that the venue evidence is “substantial” — in this context meaning “ample,” “strong,” and “overwhelming” — as well as “uncontroverted.”  *See Martinez*, 901 F.2d at 377; *Moeckly*, 769 F.2d at 462; *Jenkins*, 510 F.2d at 498-99; *see also United States v. Robinson*, 460 F.3d 550, 557 (4th Cir. 2006) (“Under harmless error review, . . . it is the Government that bears the burden of establishing that error was harmless.”).

Here, after raising their venue objections pretrial and offering a sound venue instruction, the defendants repeatedly pressed those objections in their Rule 29(a) motions at the close of the government’s case-in-chief and at the close of all the evidence, indisputably preserving them.  The district court denied the defendants’ requests for judgments of acquittal on venue grounds, justifiably ruling that the evidence was sufficient to proceed with the trial in the Western District of Virginia.  The court erred, however, by then failing to submit the venue questions to the jury, as there were “genuine issue[s] of material fact with regard to proper venue.”  *See Engle*, 676 F.3d at 413 (internal quotation marks omitted).  Simply put, in light of the government’s evidence of a more than four-year drug trafficking operation reaching from China into and throughout the United States, “the jury was able to convict the defendant[s] of the offenses charged without an implicit finding that the acts used to establish venue” — Chris Kaestner’s

14

participation in that drug trafficking operation as a Harrisonburg, Virginia subdistributor — "had been proven." *See Martinez*, 901 F.2d at 376.

Upon careful consideration of the trial evidence, we are unable to conclude that the district court's error in withholding the venue issues from the jury was harmless. Again, the government's theory that Kaestner and the defendants all participated in the same drug trafficking operation was dependent upon evidence that synthetic drugs distributed to Kaestner by Robert Schroeder between 2011 and 2015 were part of supplies shipped by defendant Jason Bradley and his then-wife Deborah Ryba from China. But the venue evidence cannot be described as "substantial and uncontroverted" within the meaning of our *Martinez* decision.

Indeed, the government concedes a lack of substantial and uncontroverted evidence that Bradley and Ryba were the source of a-PVP that Kaestner was caught selling in 2013 and that was mailed to him by Schroeder in 2015. *See* Supp'l Br. of Appellee 57-58 (acknowledging factual disputes with regard to 2013, when Bradley and Ryba were on the mid-2012 to late 2014 "break" as suppliers and Schroeder may have used "Crystaal Bubbly" packets to distribute a-PVP from other sources, and 2015, when Schroeder said he distributed a-PVP to Kaestner and defendant Nayna Taylor from a single Bradley-Ryba batch, but Kaestner's a-PVP and Taylor's a-PVP had different chemical compositions). Furthermore, the government apparently does not claim substantial and uncontroverted evidence that Bradley and Ryba were the source of MDPV distributed to Kaestner between mid- and late 2011, when Schroeder admitted he was concurrently distributing Bradley and Ryba's China MDPV and MDPV from Las

15

Vegas, Nevada suppliers. Rather, the government urges us to accept the proposition that there was substantial and uncontroverted evidence that Bradley and Ryba were the source of synthetic drugs distributed by Schroeder to Kaestner within the period from late 2011 to late 2012. *See id.* at 58 (asserting that "none of the defendants challenged the part of Schroeder's testimony establishing his ongoing relationship with Kaestner, generally, and in particular, regarding transactions in 2011 and 2012").

Contrary to the government's characterization of it, the evidence of a late 2011 to late 2012 Schroeder-to-Kaestner distribution of synthetic drugs supplied by Bradley and Ryba was not substantial and uncontroverted. The record reflects only one payment during the relevant time period (Kaestner's wire transfer of $1500 to Schroeder in May 2012) and contains no corroboration for Schroeder's testimony that such payment was for synthetic drugs supplied by Bradley and Ryba (rather than, as would have been consistent with Schroeder and Kaestner's history, items such as synthetic drugs from another source or Viagra or Xanax tablets). Furthermore, the evidence contradicting Schroeder's claim that the a-PVP he distributed to Kaestner and defendant Nayna Taylor in 2015 came from a single Bradley-Ryba batch, also calls into question Schroeder's claims about all other transactions with Kaestner, including any from late 2011 to late 2012. Finally, further questions about Schroeder's truthfulness in linking Kaestner to the charged conspiracies are raised by the evidence that Schroeder felt compelled "to go after Bradley" in a quest for less severe charges and sentencing relief.

In these circumstances, although there may have been sufficient evidence for jury findings of proper venue, there was not substantial and uncontroverted evidence such that

16

the venue issues could be withheld from the jury. Thus, we are constrained to recognize that the district court's error in failing to submit the venue issues to the jury was not harmless.[3]

## III.

Pursuant to the foregoing, we vacate the criminal judgments against Nayna Taylor, Edward Taylor, and Jason Bradley, and we remand for such other and further proceedings as may be appropriate.[4]

---

[3] Our dissenting colleague criticizes today's decision of the panel majority for all manner of purported misdeeds, including a "relentless pursuit of venue violations" that "risks subdividing conspiracies at a time when drug trafficking is becoming more integrated and expansive." *See post* 19. But it is our good friend who misfires by suggesting that the judgments should be affirmed because the defendants were accorded a procedurally-fair, three-week trial. His dissent emphasizes evidence that merely would have been sufficient for the jury to find proper venue in the Western District of Virginia, as well as more ample proof that the defendants conspired to traffic in dangerous and destructive drugs elsewhere in the United States and abroad. We are not entitled, however, to judge whether the district court's venue error was harmless by applying a "clearly guilty" rule. The Constitution itself — in Article III and again in the Sixth Amendment — guarantees every accused the right to be tried where the alleged crime was committed. Furthermore, our precedent requires that venue issues be submitted to the jury unless — unlike here — evidence of proper venue is truly overwhelming and uncontroverted. Put succinctly, the venue error in these proceedings was not at all a harmless error.

[4] Notably, the defendants raise various contentions that Kaestner's role as a subdistributor of synthetic drugs supplied by Bradley and Ryba — even if proven to a jury — would be inadequate, as a matter of law, to establish venue in the Western District of Virginia for each of the Indictment's conspiracy charges. We leave those arguments to the district court on remand. Moreover, we do not reach and assess the defendants' other appellate contentions, which include challenges to the constitutionality of the Controlled Substance Analogue Enforcement Act; to the sufficiency of the trial evidence; and to the (Continued)

17

---

propriety of jury instructions, evidentiary and privilege rulings, a Sentencing Guidelines calculation, and a forfeiture judgment.

WILKINSON, Circuit Judge, dissenting:

Conspiracies pose an especially pernicious form of criminal misconduct. As the Supreme Court recognized over a half century ago, "collective criminal agreement — partnership in crime — presents a greater potential threat to the public than individual delicts." *Callahan v. United States*, 364 U.S. 587, 593 (1961). The greater inherent capacity of collectives that informed this insight has naturally remained constant in the intervening sixty years. But the tools available to would-be conspirators, from advances in communications to innovations in transportation, have radically changed since then.

Conspiracies today are thus different in kind than they once were. Long gone are the days where planning would be confined to a kitchen table or the basement of a speakeasy. Modern conspiracies profit from instant communication spanning the entire globe. And criminal enterprises can more easily develop sophisticated logistical operations to keep pace with their increasingly international ambitions. As the conspiracy at issue here makes plain, these forces are especially prominent with respect to drug trafficking.

The majority reverses every criminal conviction after a three week trial that in fact was more than fair. In its relentless pursuit of venue violations, the majority risks subdividing conspiracies at a time when drug trafficking is becoming more integrated and expansive. In vacating multiple criminal convictions the majority introduces disharmony between the substantive principles of conspiracy and those of venue. This doctrinal schism has no place in our law. The harm of conspiracies is visited whole. Its members were thus brought to account here whole — in a single trial in a single district where the

19

conspiracy conducted operations. This was altogether right and proper, and I would affirm the convictions of each co-conspirator on every count.

I.

Venue lies for a charged conspiracy in any district where any co-conspirator has committed an act in furtherance of the conspiracy. Of course, when there is a genuine issue of material fact as to whether any overt act took place in a given district, the venue question should be sent to a jury. But when the evidence clearly shows that an act took place, judges can make their own call because there is nothing of import for the jury to decide. That happened here and I accordingly do not believe that the district court erred below. At a minimum, however, any alleged error was certainly harmless.

Christian Kaestner lived and operated in Harrisonburg, Virginia, which is squarely in the Western District of Virginia. None of the parties have challenged that Kaestner sent a wire transfer in 2012 from the Western District to co-conspirator Schroeder in exchange for synthetic drugs supplied by Bradley. The venue question should have ended there. But the majority wrests itself away from this conclusion for three main reasons. On the majority's view, the government has only a single piece of evidence from the relevant time period of late 2011 to late 2012; Schroeder's account is not corroborated and susceptible to other explanations; and Schroeder's testimony might not be wholly believable. Maj. Op. at 15-16. None of these points are persuasive.

First, the government has offered multiple pieces of uncontested evidence establishing overt acts in the Western District of Virginia from 2011 to 2012. All parties agree that there were at least three Western Union wire transfers between Kaestner, in the

20

Western District, and Schroeder dating May 17, 2011, July 21, 2011, and May 11, 2012, respectively. J.A. 899-901. The majority insists that only the last transaction is fair game because "Schroeder admitted he was concurrently distributing Bradley and Ryba's China MDPV and MDPV from Las Vegas, Nevada suppliers." Maj. Op. 15-16. But this is a stretch. Around this time, Schroeder was part of an international drug ring that spanned the United States and reached Australia, J.A. 1307-08, grossing hundreds of thousands of dollars, J.A. 2763. Virtually all of these drugs came from Bradley, who became Schroeder's exclusive provider by September 2011. J.A. 1296-97. In the prior months, Schroeder had received only "one more order" from Las Vegas while he principally dealt with Bradley. J.A. 1297. Nevertheless, the majority, taking a fly in the ointment approach, decides to write the value of *all* evidence outside of late 2011 to late 2012 down to zero.

Merits of this cramped timeframe aside, it is just not accurate that the May 11, 2012 transaction is the only piece of evidence from late 2011 to late 2012. Schroeder testified, without challenge, that Kaestner was buying Bradley's synthetic drugs from him in bulk at this time and that they used methods of payment outside of Western Union to do so. J.A. 1308; see also J.A. 3531. Schroeder also testified that he repeatedly spoke with Kaestner by phone about buying these specific drugs over that very twelve-month period. J.A. 1311. Nobody contests that Kaestner sold Bradley's drugs during this period and that he lived in a different city than Schroeder at the time. And nobody thinks they coordinated via carrier pigeon. As such, these uncontested calls discussing Bradley's drugs should have been enough to establish venue *even if* a single packet never entered

21

the Western District. As this court recently held, "simple acts such as phone calls from a district can give rise to venue in conspiracy cases." *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012).

Second, it is simply not the case that Schroeder's testimony was uncorroborated. Look no further than Bradley himself, who admitted that he was Schroeder's ultimate supplier during this timeframe. J.A. 2652. Further, the government produced uncontested shipping records from 2011 that map onto Kaestner's May 2011 and July 2011 Western Union payments. J.A. 2405-06. As to the third payment, the majority claims that the May 2012 transaction can be explained away "as synthetic drugs from another source," consistent with Schroeder's testimony. Maj. Op. at 16. But that is not true. As noted, Schroeder testified — and each defendant in the case let his testimony stand — that Bradley was his exclusive supplier at that time. J.A. 1310, 1487.

Third, the majority makes a final push by attacking Schroeder's veracity. It says that Schroeder may have provided his testimony as part of a "quest for less severe charges and sentencing relief," and that this is reason to doubt his credibility. Maj. Op. at 16. But the jury heard all of this, as it should have, from Bradley's counsel, who pressed Schroeder on cross-examination as to whether he manufactured information about Bradley in exchange for a lenient sentence on his various drug offenses. J.A. 1521-25. And the jury returned verdicts of conviction nonetheless. Had Schroeder, the government's principal witness, not been credible, it is hard to believe that the jury would ever have found the defendants guilty.

The majority's approach to harmless error is made worse by the fact that it does not even attempt to differentiate among defendants. To be sure, the majority recites the settled principle that we must analyze venue for each count. Maj. Op. at 12. But this maxim falls away for the rest of the opinion, as the majority indiscriminately treats Bradley no different than the Taylors. In particular, venue lies for Count II (drug importation conspiracy) in any district where the illicit substance passes through. *United States v. Lowry*, 675 F.2d 593, 596 (4th Cir. 1982). Applied here, that means that venue is certainly proper for Bradley, the only defendant charged under the drug importation statute, provided that one of his packets touched the Western District. As to that, the evidence here is more than sufficient: No party contested that Kaestner was buying MDPV from Schroeder in bulk during a period when Bradley was Schroeder's exclusive provider, and Bradley himself testified that he was sending drugs to Schroeder at this time. Indeed, Bradley even said as much when he virtually *conceded* that venue was proper as to *Count I* (drug trafficking conspiracy). Brief of Appellants at 70; Reply Brief of Appellants at 13-15; Supplemental Brief of Appellants at 25-26. None of this even merits mention in the majority opinion.

For all the above reasons, I have no trouble concluding that the government has supplied "substantial and uncontroverted" evidence to establish venue for each count in this case. *United States v. Martinez*, 901 F.2d 374, 377 (4th Cir. 1990). Venue turns on the existence of *any* overt act by *any* co-conspirator to the alleged conspiracy. The majority loses sight of this confined question and instead takes the phrase "substantial and uncontroverted" as an invitation to interrogate the broader merits of the substantive

23

conspiracy charge. As discussed below, this approach has not only led the majority to be dead wrong on the facts, but also risks placing venue and substantive conspiracy law at doctrinal odds.

## II.

At the heart of conspiracy law is the notion that conspirators are liable for the acts of their co-conspirators so long as they share a common purpose. *Salinas v. United States*, 522 U.S. 52, 64 (1997) (recognizing that in a conspiracy "the supporters are as guilty as the perpetrators"). In tandem with that principle, conspirators are generally to be tried together, and courts resist splitting conspiracies into granular sub-schemes across countless cases. This system makes sense. A moment's reflection reveals the propriety of prosecuting a complex, interconnected conspiracy in a single, comprehensive trial — and, as one would expect, the Supreme Court has repeatedly affirmed this intuition. See *Salinas*, 522 U.S. at 64 (reaffirming "the common-law principle that, so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators").

Criminal defendants have tried to wiggle out from under the weight of this proposition time and again. But their various arguments, all pegged toward fracturing conspiracy prosecutions across multiple trials, have uniformly met a similar fate.

Take, for instance, the view that what might appear to be a single conspiracy is, in fact, a collection of non-overlapping schemes. Although true in some circumstances, see *Kotteakos v. United States*, 328 U.S. 750 (1946), this argument must overcome a high bar in our circuit, see *United States v. Johnson*, 54 F.3d 1150, 1154 (4th Cir. 1995). The touchstone for a conspiracy is a shared purpose rather than the ambitions or expectations

24

of any single conspirator. For this reason, "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *United States v. Allen*, 716 F.3d 98, 103 (4th Cir. 2013) (internal citation omitted).

Likewise, membership in a conspiracy is not measured by job title; not just top-level participants are on the hook. See *United States v. Cornell*, 780 F.3d 616, 631 (4th Cir. 2015) (recognizing that "outsiders who help the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable" for the conspiracy). Of a part with the principle that conspiracies should not lightly be sub-divided, we have held that a conspiracy continues until it comes to a clear, permanent end. For example, the "[a]rrest of some co-conspirators does not, as a matter of law, terminate a conspiracy." *United States v. Grubb*, 527 F.2d 1107, 1109 (4th Cir. 1975). Relatedly, an individual conspirator is deemed to remain a part of a conspiracy until he affirmatively withdraws. See *Smith v. United States*, 568 U.S. 106, 109 (2013). Both of these doctrines were fashioned with a practical eye. For one, conspiracy prosecutions would quickly run aground if every setback to a conspiracy's operations produced a legally distinct criminal scheme. Moreover, prosecutions would soon find themselves stymied if every professed trepidation terminated conspiratorial involvement.

Putting all this together, the "presumption that defendants indicted together should be tried together is especially strong in conspiracy cases." *United States v. Holohan*, 436 F. App'x 242, 244 (4th Cir. 2011). It makes no sense for judicial resources to be drained and witness time to be consumed with what amounts to repetitive trials and testimony.

25

The Supreme Court has admonished that severance under Federal Rule of Criminal Procedure 14 is warranted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). District courts rightly possess primary discretion in making this judgment. *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010) (emphasizing "broad discretion" afforded to district courts); *United States v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002). And, to the extent that the defendant suffers prejudice, proper limiting instructions are thought to be curative. *Zafiro*, 506 U.S. at 539; *Najjar*, 300 F.3d at 475. In short, the all-for-one and one-for-all mentality that often motivates conspiracies also governs how they are brought to justice.

Now comes the law of venue, which itself elegantly maps onto core principles of conspiracy law. The basic rule for venue in conspiracies, as the Supreme Court has "long held" but as the court risks impairing today, is that venue lies "in any district in which an overt act in furtherance of the conspiracy has been committed." *Whitfield v. United States*, 543 U.S. 209, 218 (2005). These acts can be large or small, see *United States v. Smith*, 452 F.3d 323, 335 (4th Cir. 2016), and performed by any member of the conspiracy, see *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012). Accordingly, the two lines of doctrine work seamlessly: While conspiracy law pushes strongly in favor of single conspiracy prosecutions, see *Richardson v. Marsh*, 481 U.S. 200, 209–10 (1987), venue principles concomitantly provide for the fora where that single trial could be held

26

all at once, see *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995). It is this fluid operation, however, that the majority risks disrupting with its decision.

III.

Taking the majority's argument against the government's venue evidence at face value, see Maj. Op. at 15-16, I worry that its real damage is to conspiracy law itself.

As noted, the law of venue and conspiracy are a smooth fit. In so many words, venue is a threshold inquiry concerned with the "where," while the substantive charge of conspiracy deals more with the "who, how, and why." To determine venue in the context of conspiracy, we ask simply whether there has been *any* act in furtherance of the alleged conspiracy in a given district. See *United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990). In so doing, we take the general conspiracy *as alleged*.

This makes sense. After all, venue principles stem from the constitutional dictate that crimes must be tried where they were allegedly committed. See *United States v. Johnson*, 323 U.S. 273, 276 (1944). Intuitively, this has little to do with the guilt or innocence of a given defendant; quite often, in fact, defendants claim that no crime occurred in the first place. Because venue is largely separate from the merits, an overt act by any one conspirator can establish venue for any other co-conspirator, even when an overt act is not required to convict someone of the underlying conspiracy charge. *Whitfield v. United States*, 543 U.S. 209, 218 (2005); see also *United States v. Bowen*, 224 F.3d 302, 309 (4th Cir. 2000) (noting that "even a venue in which the defendant has never set foot" may be proper). Likewise, venue is established by a preponderance of the evidence, *United States v. Barsanti*, 943 F.2d 428, 434 (4th Cir. 1991), and can be settled

27

by a judge, while the other elements of a conspiracy charge are resolved under a reasonable doubt standard by the jury, *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996).

The majority, however, takes a different tack. Indeed, much of its decision is aimed against the government's theory of the comprehensive four-year conspiracy. See Maj. Op. at 6-7, 15-16. For instance, the majority casts doubt on Bradley and Schroeder's relationship, *id.* at 6; suggests that the criminal enterprise may not have survived a protracted "break" from 2012 to 2014, *id.* at 7; and alludes to the idea that the Taylors may have sold drugs as part of a separate criminal conspiracy involving Schroeder, *id.* at 7, 15. These points all involve an implicit analytic premise: To determine whether there has been an act in furtherance of the charged conspiracy, a jury must necessarily determine the exact scope and contours of the conspiracy itself. How else, the argument goes, can one decide whether a certain act was in furtherance of the relevant conspiracy, as opposed to advancing a separate criminal scheme or a different enterprise entirely.

This is misguided. In short, the majority is constructing a venue inquiry that would contain preliminary versions of all the same questions one asks when settling the merits of a conspiracy charge: whether a common agreement existed; what its objects and methods were; who participated; and so on. To put a finer point on it, the majority is proposing a venue inquiry where factfinders no longer take the conspiracy as alleged and focus on the existence vel non of an overt act, but rather inquire as to the nature of the conspiracy itself. Thus while packaged as an argument about venue, the majority's position is in reality an attempt to assess merits arguments in favor of severance that

28

would falter under substantive conspiracy law. As but one example, contrast the majority's multiple references to a "break" in the conspiracy as undermining venue, with our case law holding there must be a clear, affirmative act to end a conspiracy. Looking ahead, it takes little imagination to see how defendants will use today's decision: to try to accomplish through the threshold inquiry of venue what they cannot under settled conspiracy law — namely, the fracturing of conspiracy prosecutions across multiple cases and venues spanning the country.

The majority's doctrinal mistakes here are again compounded by the fact that it fails to assess each charge independently. Take the money-laundering statute at issue for Bradley. In *United States v. Cabrales*, 524 U.S. 1 (1998), the Supreme Court interpreted an earlier version of the law to require that money-laundering prosecutions be brought where the money was laundered rather than where the underlying crime took place. While the Court was ambiguous as to how its holding would impact alleged co-conspirators, Congress did not take any chances. It promptly amended the money-laundering statute to ensure that venue for a conspirator may lie in any district "where an act in furtherance of the attempt or conspiracy took place." 18 U.S.C. § 1956(i)(2). In other words, Congress made clear that longstanding principles of venue and conspiracy would also govern the money-laundering context. As earlier noted, applying these principles to the facts confirms that venue was especially appropriate for Bradley on the money-laundering counts. But the court does not mention this statute once in its analysis, instead vacating each conviction in one fell swoop.

At bottom, the core deficiency in the majority opinion is that it fails to appreciate how the "substantial and uncontroverted" evidence standard operates in the context of the venue inquiry. It is, as the trial court recognized, a straightforward matter. We take the conspiracy as alleged and ask whether there is ample, clear evidence of an overt act in furtherance, large or small. Here there plainly was that much and more. The conspiracy as alleged operated in the Western District of Virginia. More than one overt act indisputably occurred there. Its members were properly tried in that district. To hold otherwise is not consonant with the facts or consistent with our law.

\* \* \*

These points are not purely academic. "Bath salts," despite their euphemistic label, ravage individuals and lay waste to communities. See J.A. 1889 (describing the common hollowed out condition among users of these drugs in the Taylors' community). As this case makes painfully clear, the legal doctrines at issue have broad practical implications for how our nation addresses the scourge posed by these increasingly sophisticated drug combinations and the far-reaching conspiracies that have developed around them.

Such conspiracies represent, as the jury understood, a hideous form of criminal misconduct. Their success is often pegged to piling addiction on those with the deck already stacked against them, thus weighing the odds of life ever more heavily against the dispossessed. In so doing, drug traffickers fashion not only a dependent clientele, but a despicable model of modern servitude — a method of conscription that strips its victims of the power to make something of themselves through the dignity of work and the cherished bonds of stable familial life. In no uncertain terms, these criminal schemes

30

profit off the very extinction of human purpose. They destroy those whom I have no doubt would have something fine to give our dear country, if only given half a chance.