**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4032**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GREG A. LESTER, a/k/a Gregory A. Lester,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Bluefield. David A. Faber, Senior District Judge. (1:17-cr-00195-3)

Submitted: March 18, 2020                           Decided: June 3, 2020

Before THACKER and HARRIS, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

David Schles, LAW OFFICE OF DAVID SCHLES, Charleston, West Virginia, for Appellant. Michael B. Stuart, United States Attorney, Charleston, West Virginia, R. Gregory McVey, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Greg Lester ("Appellant") was charged with 12 counts of conspiracy, arson, mail fraud, and money laundering offenses arising from an overarching scheme to commit insurance fraud. Following a jury trial, Appellant was convicted of one count of arson conspiracy, one count of money laundering conspiracy, one count of money laundering to conceal, and one count of unlawful monetary transaction. As a result, Appellant was sentenced to 60 months of imprisonment.

On appeal, Appellant raises three assignments of error. Appellant argues that (1) the district court abused its discretion by denying his motion for severance; (2) the district court erred by denying his motions for judgment of acquittal and new trial; and (3) his sentence was procedurally and substantively unreasonable.

For the reasons detailed herein, we affirm in all respects.

I.

A.

Indictment

On November 14, 2017, a grand jury indicted Appellant and his three co-defendants -- his father, Windel Lester ("Windel"); his father's then-wife, Georgetta Lester ("Georgetta"); and his brother, James Lester ("James") (collectively, "the Lesters") -- in a 28-count indictment charging a scheme to commit insurance fraud in connection with two separate fires at properties in Matoaka and Huntington, West Virginia. On December 19, 2017, a grand jury returned a superseding indictment which added a new defendant, James Browning, as well as an additional fire at a property in Ikes Fork, West Virginia. And,

2

finally, on February 21, 2018, a grand jury returned a 40-count second superseding indictment against all defendants ("Superseding Indictment"). After all was said and done, Appellant was charged in 12 counts of the Superseding Indictment as follows:[1]

- one count of mail and wire fraud conspiracy (18 U.S.C. § 1349) stemming from the Matoaka, Huntington, and Ikes Fork property fires, in violation of 18 U.S.C. §§ 1341 and 1343, respectively (Count One);

- one count of arson conspiracy (18 U.S.C. § 844(h)(1)) stemming from the Matoaka, Huntington, and Ikes Fork property fires, in connection with mail and wire fraud conspiracy, mail fraud, and wire fraud (Count Two);

- one count of money laundering conspiracy (18 U.S.C. § 1957) stemming from the Matoaka, Huntington, and Ikes Fork property fires, in connection with mail fraud, wire fraud, and arson to commit mail and wire fraud (18 U.S.C. § 844(h)(1)) (Count Three);

- five counts of mail fraud (18 U.S.C. § 1341) stemming from the Huntington property fire (Counts Twenty through Twenty-Four);

- one count of aiding and abetting arson to commit mail fraud (18 U.S.C. §§ 2 and 844(h)(1)) stemming from the Huntington property fire, in connection with mail and wire fraud conspiracy, mail fraud, and wire fraud (Count Twenty-Seven);

- one count of aiding and abetting an unlawful monetary transaction (18 U.S.C. §§ 2 and 1957) stemming from the Huntington property fire, in connection with mail fraud and arson to commit mail fraud (Count Twenty-Eight);

- one count of aiding and abetting money laundering to conceal (18 U.S.C. §§ 2 and 1956(a)(1)(B)(i)) stemming from the Matoaka property fire, in connection with mail

---

[1] In each count, Appellant was charged with one or more of his co-defendants.

fraud, wire fraud, and arson to commit mail and wire fraud (Count Twenty-Nine); and

- one count of aiding and abetting an unlawful monetary transaction (18 U.S.C. §§ 2 and 1957) stemming from the Matoaka property fire, in connection with mail fraud, wire fraud, and arson to commit mail fraud (Count Thirty-One).

As relevant here, the Superseding Indictment alleged as follows. From 2012 to 2016, the Lesters conspired with Browning, Dudley Bledsoe, and Ricky Gleason (collectively "Defendants"[2]) to execute a scheme whereby they set fire to properties and then submitted fraudulent insurance claims on the properties. As a result of the scheme, Defendants allegedly defrauded insurance companies out of approximately $789,000.

Defendants used Lester Home Center (the "Center"), located in Ikes Fork, West Virginia, as the base for their conspiratorial operations.[3] There, they obtained accelerant to set the fires, used the Center's fax machine to submit fraudulent insurance claims, and cashed some of the insurance checks. Specifically, for their fraudulent insurance claims, they also created fraudulent receipts to make it appear as though they had purchased furniture from the Center which was lost in the property fires.

---

[2] Bledsoe and Gleason were unindicted co-conspirators.

[3] The Lester Home Center was owned by Windel and operated by the Lesters. The Center sold various home and hardware supplies.

4

1.

Matoaka Property Fire

In spring 2012, Bledsoe and James met with the owner of the Matoaka property and agreed to purchase the property for $38,000. Bledsoe and James then met with Windel who agreed to provide the money for the purchase of the Matoaka property. On August 23, 2012, at Windel's direction, Georgetta wrote a check for $38,000 from her and Windel's joint account at Pioneer Bank. She gave this check to Bledsoe for the purchase of the property. The next day, Bledsoe purchased a cashier's check from Pioneer Bank for $38,000, payable to the owner of the property. Thereafter, Bledsoe purchased insurance coverage for the property and recorded the deed for the property. Bledsoe and James agreed to equally pay the cost of the insurance premiums for the property.

Sometime before December 1, 2012, Bledsoe and James made plans to burn down the Matoaka property. The pair obtained unscented candle oil from the Center in order to set the fire without the ignition source being detected by the fire department.[4] And on December 1, 2012, the pair executed their plan by spreading unscented candle oil in the bedroom and kitchen of the Matoaka property and setting the oil on fire. Bledsoe and James concocted a story that the fire was a "kitchen-related incident." J.A. 38. The next

---

[4] Apparently, Defendants were under the impression that unscented candle oil could not be traced as an accelerant source. When asked about the "significance of the unscented candle oil" as to the Huntington property fire, Gleason testified that the unscented candle oil "couldn't be traced" for purposes of "ignit[ing] the fire." J.A. 540. Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

day, Bledsoe reported the fire to the insurance company. Bledsoe also filed a fraudulent notice of loss from the fire with the insurance company.

Thereafter, the insurance company paid approximately $290,000 in insurance proceeds for the reported loss from the fire. Bledsoe, Georgetta, James, Windel, and others known and unknown to the grand jury shared in these proceeds. On October 16, 2013, Appellant withdrew $11,965 from his bank account to purchase a cashier's check in the amount of $11,960. The cashier's check was then used to reimburse Windel and Georgetta for the purchase of a 2014 Chevrolet Impala.

2.

Huntington Property Fire

In April 2013, Gleason and Windel agreed to purchase the Huntington property. On May 13, 2013, they obtained a deed which indicated Gleason was the purchaser of the property. Georgetta and James purchased cashier's checks in the amount of $72,000 and $27,500, respectively, for the purchase of the property, showing Gleason as the remitter. Georgetta used the insurance proceeds from the Matoaka property fire in order to purchase her cashier's check for the property. Gleason also purchased insurance coverage for the property.

On May 29, 2013, Appellant drove Gleason, Windel, and an unnamed, known person in Appellant's truck to the closing of the Huntington property. Following the closing, the four collected and purchased used furniture for staging of the property fire. They loaded the furniture into Appellant's truck, and Appellant drove the furniture to the property.

6

In order to provide an alibi, Appellant, Gleason, and Windel agreed the arson would occur when Appellant and Gleason were on vacation in Las Vegas. During this Las Vegas trip, on June 13, 2013, Windel and an unnamed known person set fire to the Huntington property by placing cardboard boxes soaked with unscented candle oil in the attic and then igniting them. Gleason later reported the fire to the insurance company and provided a fraudulent receipt of the lost property from the Center, which Georgetta prepared. The insurance company paid approximately $284,000 in insurance proceeds. Members of the conspiracy shared approximately $260,000 of these proceeds.[5]

3.

Ikes Fork Property Fire

On May 26, 2013, Browning and James drafted a bill of sale for $50,000 for the sale of the Ikes Fork property. The bill reflected a sale between the two, with James as the seller and Browning as the purchaser. Thereafter, Browning secured insurance coverage for the property and paid six months' worth of premiums. On August 1, 2013, Browning and James created a deed of conveyance for the property, conveying the property from Browning back to James. On August 13, 2013, the Office of the Clerk of Wyoming County, West Virginia, recorded the deed wherein Browning and James each paid $5,000 for the purchase of the property.

---

[5] The Presentence Report explains the insurance company paid the remaining $24,000 of these proceeds to other companies associated with Gleason's fraudulent insurance claim, including Eagle View Technology, First Response, Fire & Safety, Assured Relocation, and National Vendor.

On August 16, 2013, after again obtaining unscented candle oil, Bledsoe and Browning drove to the Ikes Fork property. Once there, they staged a fire by placing cardboard boxes and oil throughout the house. Once Bledsoe and Browning finished staging the fire, Browning and James went to the West Virginia State Fair in order to create an alibi. The next day at the direction of Browning and James, an unnamed, unknown person set fire to the property. On August 27, 2013, Browning and James created another deed of conveyance for the property, conveying the property again from James to Browning.

Following the Ikes Fork property fire, between early September 2013 and November 19, 2013, Browning sent the following documents to the insurance company with respect to his purported losses: May 26, 2013 bill of sale; August 27, 2013 deed of conveyance; receipts for items purchased from the Center; receipts for rent paid by Browning to James and an unnamed relative; and a personal property loss schedule. Browning secured an attorney in order to receive payment from his false insurance claims. The attorney filed a lawsuit on Browning's behalf, which was later settled for $150,000. After attorney fees and expenses, Browning received $100,000.

On January 7, 2016, Browning took the $100,000 check to the bank and converted it to a $30,000 cashier's check payable to an unnamed relative and $70,000 in cash. Bledsoe, Browning, and James divided the $70,000 in cash amongst themselves.

B.

Pre-trial Proceedings

1.

Motion to Sever

Appellant filed a motion to sever, "alleg[ing] that other co-conspirators are more or less culpable" than he was. J.A. 117. Appellant asserted, "The 'spillover' effect from testimony against more culpable co-defendants will prejudice [him]. . . ." Suppl. Pre-trial Mot. at 3, *United States v. Lester et al*, No. 1:17-cr-00195-3 (S.D. W. Va. filed Apr. 10, 2018), ECF No. 197. Specifically, Appellant argued that severance from his co-conspirators was necessary due to "the strong possibility of multiple conspiracy evidence" where he was "alleged to have substantially participated in one of three arsons alleged in the indictment." *Id.*

On June 19, 2018, the district court denied Appellant's motion to sever. The district court reasoned "severance 'requires more than finger pointing' as to comparative culpability." J.A. 117 (quoting *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002)).

2.

Cooperation Agreement

Ultimately, Browning entered in a cooperation agreement with the Government and joined unindicted co-conspirators Bledsoe and Gleason as cooperating witnesses in the prosecution of Appellant. The Government offered Appellant a cooperation agreement, but he declined the offer and proceeded to trial.

C.

Trial

Over the span of an eight day trial, the Government called 20 witnesses. Four witnesses in particular -- Bledsoe, Gleason, Laron Safford,[6] and William Toler[7] -- testified as to Appellant's knowledge of and participation in the scheme.

1.

Matoaka Property Fire

Bledsoe, a friend of the Lesters, testified as follows with regard to the Matoaka property fire.

In 2012, Bledsoe and James agreed to purchase the Matoaka property, burn it, file an insurance claim, and split the money from the insurance proceeds. The pair borrowed the money for the purchase from Georgetta and purchased the property for $38,000. Georgetta wrote the check at the Center in the presence of Bledsoe, James, and Windel. After purchasing the property, Bledsoe and James obtained unscented lamp oil from the Center in order to burn the property. They used lamp oil because James told Bledsoe "it couldn't be detected." J.A. 318. The pair burned the property on December 1, 2012.

Once the property was burned, Bledsoe submitted a fraudulent claim to his insurance company via the fax machine at the Center. The fraudulent claim included,

---

[6] Safford was a cooperating witness who was housed in the same jail facility as Appellant.

[7] Toler was a cooperating witness who pled guilty to an offense unrelated to the Defendants' scheme.

among other items, a $13,219 receipt for household items and furniture purchased from the Center and a $1,550 receipt for Bledsoe's payment of rent to Windel, ostensibly paid after the property was burned because Bledsoe supposedly had to stay at Windel's home.

After receiving the fraudulent claim, the insurance company paid Bledsoe approximately $290,000 in a series of checks. Appellant, Bledsoe, Georgetta, James, and Windel shared these fraudulent proceeds. In particular, Appellant received a September 30, 2013 check for $17,190 from Bledsoe. And on October 4, 2013, Appellant drove to Pioneer Bank[8] to deposit the check to his personal checking account, which had a negative balance of $34.53 at the time. The Government introduced a copy of the front and back of the $17,190 check along with its deposit ticket, showing that Appellant had deposited the check into his bank account. The Government also introduced a copy of an October 16, 2013 cashier's check in the amount of $11,965, showing that Appellant purchased the check payable to Windel from Appellant's Pioneer Bank account. Thereafter, Georgetta and Windel used these proceeds to write a check for $11,960 payable to Hurricane Chevrolet to pay for a 2014 Chevrolet Impala for Christina Cox, one of Windel's friends.

Nonetheless, Bledsoe testified that Appellant "100 percent" had nothing to do with the Matoaka property fire. J.A. 404.

---

[8] Of note, Windel was a director on the Board of Directors of Pioneer Bank.

11

2.

Huntington Property Fire

Toler, a friend who played poker with Appellant and Windel, testified about the June 13, 2013 Huntington property fire. Toler testified that he, Appellant, Gleason, and Windel moved furniture into the property in order to stage the arson. Toler testified, "[m]ost of the time when [Appellant] would pick me up, [the furniture] was already loaded on the trailer." J.A. 449. Toler further testified that Appellant told him "Windel actually helped with the fire." *Id.* at 477; *see also id.* at 478 (Q: "[Appellant] told you that Windel actually helped with the fire?" A: "I think maybe [Appellant] and Windel told me. I think Windel was maybe sitting across the road somewhere or something maybe watching the guy, watching the guy do it maybe."). Per Toler, while he, Appellant, and Gleason were in Las Vegas, Windel called Appellant and informed him "the deal was done." *Id.* at 453.

Gleason, another poker friend of Windel, echoed the testimony of Toler. Gleason testified that Windel approached him about purchasing the property and then burning it in order to collect insurance proceeds. Gleason testified that Windel gave him $100,000 to purchase the Huntington property, which Gleason did. Gleason testified that he concocted a story in order to facilitate the purchase of the property from the realtor, Ada Pancake. The story was that Gleason intended to "let [his] son live in [the property] while [his son] went to college and maybe rent out some rooms to offset the mortgage payment." J.A. 530. Gleason testified that this story was untrue and that he would not let his son nor himself live in the property due to its poor condition. He testified, "The house was in pretty

12

bad shape. It -- the owner, previous owner had several, like 30 cats I was told. And the house wreaked of cat urine, couldn't hardly stand to be in it." *Id.* at 531.[9]

Gleason testified that he, Appellant, Windel, and Toler went to the closing on the Huntington property. After the closing on the property, the group staged the fire. Gleason further testified that they "unloaded the trailer and truck, what furniture [they] had on there, the bed, treadmill, other things." J.A. 537. These were all things that "weren't very valuable basically, just something to make [the property] look lived in." *Id.* He testified that, after unloading this set of furniture, they "drove around to yard sales and Goodwill, picked up things like mattresses and a TV and just things that just . . . wasn't very valuable at all." *Id.* Along with the furniture, the group also put "unscented candle oil on the back of the wall" so the fire starters "[c]ouldn't be traced" after igniting the oil. *Id.* at 540. Windel told Gleason that he wanted to burn the property while they were away in Las Vegas "[t]o make it look better." *Id.* at 539.

For his part, Safford testified that he, Appellant, James, and Windel were transferred together from jail for their respective court appearances. According to Safford, during their transport, Safford and Appellant discussed the charges each were facing. Safford testified that during the ride to the courthouse, Appellant told him that he had "befriended [Toler] playing poker. They was [sic] poker partners. And that he was trying to help [Toler] out

---

[9] Pancake testified and confirmed Gleason's testimony about the strong odor of cats in the home. She testified that, on the day of closing, Windel and Gleason were accompanied by a third person who waited in the car while Windel and Gleason closed on the property. She also testified the "car [had] a trailer on the back of it. Now, I don't mean a house trailer or anything just one like you'd load wood in or whatever." J.A. 591.

13

with making some money.  [Appellant] helped [Toler] put some furniture in his house, and if [Toler] burned it down, collect insurance money."  J.A. 642–43.  Safford also testified, "[Appellant] mentioned that he thought they [Gleason, Bledsoe, and Toler] was [sic] scared, they would probably think that [Appellant] would retaliate on [them]."  *Id.* at 644.

3.

Ikes Fork Property Fire

Bledsoe testified that he, Browning, and James were involved with the fire at the Ikes Fork property, which was located near the Center.  Bledsoe testified that when James initially solicited his involvement with the property, Bledsoe rejected him, but later changed his mind and "went in [sic] partners with him."  J.A. 354.  Neither Bledsoe nor James could purchase the property in their own names, however, because they both had purchased the previously burned Matoaka property.  So, James recruited Browning, who purchased the Ikes Fork property and insurance coverage on it in his name on behalf of Bledsoe and James.

Bledsoe testified that, before the fire, the group improved the Ikes Fork property by installing "vinyl siding," "buil[ding] a back deck," and "put[ting] up a few bannisters in the front."  J.A. 356.  Thereafter, Bledsoe and Browning purchased unscented lamp oil from the Center and staged the fire at the Ikes Fork property.  Then, on August 17, 2013, they dispersed the unscented lamp oil, boxes, and papers in the eaves of the house.  Bledsoe and Browning did not ignite the fire, however.  That night, in order to avoid any connection to the property, Browning and James went to the West Virginia State Fair in order to have an alibi for the property fire.  According to Bledsoe's testimony, he did not know who set

14

fire to the property. Bledsoe did know the group discussed paying the arsonist for burning down the property.

Gleason testified that after the fire, he and Windel drove to the Ikes Fork property so Windel could show him "how well [it] burned compared to the [Huntington property fire]." J.A. 551. Windel said to Gleason, "This is how a house should burn." *Id.*

4.

Verdict

After the close of the evidence, Appellant moved for judgment of acquittal on all counts against him, challenging the sufficiency of the evidence. The Government agreed with Appellant as to Count Twenty-Eight and dismissed that count voluntarily. The Government argued it presented sufficient evidence on the remaining counts relative to Appellant. The district court reserved its ruling on the motion.

At the conclusion of the trial, the jury convicted Appellant of four of the 11 counts remaining against him as follows: arson conspiracy (Count Two); money laundering conspiracy (Count Three); money laundering to conceal (Count Twenty-Nine); and unlawful monetary transaction (Count Thirty-One).

Appellant then filed a post-trial motion for judgment of acquittal, or in the alternative for a new trial, challenging the sufficiency of the evidence. The district court denied Appellant's motion, concluding that the weight of the evidence at trial supported Appellant's convictions.

15

## D.

## Sentencing

In advance of sentencing, utilizing the United States Sentencing Guidelines ("Guidelines"), the United States Probation Office prepared a Presentence Investigation Report ("PSR"). The PSR calculated Appellant's total offense level as 24, and his Criminal History Category as I, resulting in a Guidelines imprisonment range of 51 to 63 months. The total offense level of 24 included a two-level reduction for Appellant's minor role in the offense. But Appellant objected to this two-level reduction, claiming he should instead receive a four-level reduction for a minimal role.

At sentencing, the district court applied the two-level reduction for a minor role because it determined there was a "significant difference between [Appellant] and [Georgetta's]" roles in the offense. J.A. 1000. The district court explained:

> [Appellant] helped stage the Huntington property, set it up to be burned. He knew the fire was going to occur. He, he went to Las Vegas with Ricky Gleason to establish an alibi.
>
> He called multiple times after the claim was filed to inquire where the insurance money was; received the proceeds; deposited it in the bank account; and purchased a cashier's check that was provided to Windel Lester.
>
> I think he was deeply involved here, much more so in the whole scheme than [Georgetta] was, with knowledge of the whole scheme. . . .

*Id.* Thus, the district court determined "a four-level downward adjustment is not appropriate," but "[a] two-level downward adjustment is." *Id.*

16

Thereafter, the district court heard sentencing arguments. Appellant argued that, when fashioning an appropriate sentence, the district court should take into consideration the sentences of Bledsoe (24 months of imprisonment) and Georgetta (36 months of imprisonment), but he made no mention of the sentence of Gleason. The district court noted, "[Bledsoe] pled guilty, accepted responsibility, and cooperated with the Government." J.A. 1005. The district court did not respond to Appellant's argument as to Georgetta.

Appellant then turned to his acceptance of responsibility argument. Appellant argued that his culpability should be compared to Bledsoe and Gleason "even though they cooperated because he couldn't cooperate." J.A. 1006. In this regard, Appellant claimed he "was in a box in terms of cooperation and acceptance of responsibility that he could not get out of unless he agreed to do 10 years in prison." *Id*. at 1005–06. According to Appellant, when he spoke with the Government about cooperating during plea negotiations, the Government offered him a plea to "Count Twenty-Seven, . . . which if he accepted . . . would have subjected him to a ten-year mandatory minimum prison sentence." *Id*. at 1005. He asserted that his other co-conspirators "did not have that same pressure placed on them," and, therefore, "[t]hey were permitted to cooperate and to accept responsibility where [he] was never permitted on the same level as them to do that." *Id*. at 1006. In addition to Appellant's arguments about his minimal role, his co-conspirators' roles, and his co-conspirators' sentences, he also argued that he deserved a below Guidelines sentence due to his lack of criminal history.

In allocution, Appellant expressed his desire to return home to support his wife and two daughters, who depended on him. The district court responded, "Well, you should have thought of them before you burned down somebody's house, Mr. Lester. That's all I have to say about that." J.A. 1008. Thereafter, in support of a within Guidelines sentence, the Government noted Appellant "ha[d] a lovely wife and kids" but "[h]e had those when he was committing these crimes." *Id.* at 1010. The Government also asserted Appellant made his choice to reject its plea, and, therefore, "he needs to bear responsibility for it." *Id.*

Ultimately, the district court sentenced Appellant to a within Guidelines sentence of 60 months of imprisonment on each count, to run concurrently. In imposing sentence, the district court explained:

> [T]he Court believes it's under a heavy obligation in this type of case to impose a sentence that will have hopefully a significant deterrent impact upon others. The arson problem is a significant problem in this district and I believe that this defendant was deeply culpable in the situation.
>
> The arsons in this case exposed firefighters, other first responders, and neighbors to potential injuries and even death.
>
> The arsons in this case resulted in financial losses to insurance companies which resulted in increased costs to every homeowner in southern West Virginia through rising insurance premiums.
>
> The Court believes that this defendant was aware of the illegal activities of his father and his brother and he tried to distance himself from involvement, full involvement in those activities, but he was significantly involved with awareness of what was going on.

18

> Based on all these factors, I believe that the sentence near the top of the guidelines is appropriate in this case.

J.A. 1014–15.

## II.

## A.

## Motion to Sever

### 1.

Appellant argues the district court erred by denying his motion to sever in light of the evidence of multiple conspiracies against his co-defendants, and the allegations of his involvement in just one of the conspiracy's three schemes. We review a district court's denial of a motion to sever for abuse of discretion. *See United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019).

### 2.

Appellant contends that the "spillover effect" of the evidence against his co-defendants, who he contends "were clearly far more culpable," demonstrated that the failure to grant his severance motion prejudiced him. Appellant's Br. 33. Appellant also contends that the split jury verdict demonstrates the inability of the jury to properly weigh the evidence admissible against him as compared to his conspirators. For its part, the Government argues severance was not appropriate here, particularly as "[t]here was no count in which [Appellant] was charged alone." Gov't's Br. 23. The Government also argues that the split verdict actually indicated that the jury carefully weighed all the

evidence against each defendant as it found Appellant guilty of only some of the counts against him.

3.

Rule 8(b) of the Federal Rules of Criminal Procedure provides that the government may charge defendants together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Indeed, our system prefers joint trials of defendants who are charged together because joint trials "promote efficiency" and "avoid[] the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks omitted). Pursuant to Rule 14 of the Federal Rules of Criminal Procedure, a court may sever this joinder "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government. . . ." Accordingly, a court should grant a motion to sever "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

The moving party must offer "more than finger pointing" to demonstrate prejudice. *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (concluding the hostile cross-examination of the defendant by his co-defendants and the government did not demonstrate prejudice "ris[ing] above mere finger pointing, which does not provide the stark conflict necessary for relief [of severance]"). And contentions concerning alleged disproportional weight of evidence against co-defendants -- such as in conspiracy cases -- does not rise above the level of mere finger pointing. *See United States v. Brooks*, 957 F.2d 1138, 1145

20

(4th Cir. 1992) ("If this were the case, motions to sever, which are rarely granted in conspiracy cases, would have to be granted almost as a matter of course." (citation omitted)); *see also Oloyede*, 933 F.3d at 312 (rejecting co-defendants' argument concerning alleged disparity in evidence among other co-defendants and this disparity's alleged "unfair spillover effect on their right to a fair trial" (alteration omitted)).

Here, as the district court recognized, Appellant fails to do more than simply point fingers at the weight of evidence against him as compared to his co-conspirators. In any event, the jury verdict resolved Appellant's concern about the jury's inability to carefully weigh the evidence at trial among the defendants by finding Appellant guilty of only some of the counts against him.

We, therefore, affirm the district court's denial of Appellant's motion to sever.

B.

Motion for Judgment of Acquittal

1.

Appellant argues that the Government failed to present sufficient evidence of his knowledge and participation in the arson and money laundering conspiracies. Appellant also argues that the Government failed to present sufficient evidence to support the substantive money laundering convictions. For its part, the Government argues that the witness testimony and documentary evidence presented at trial amounted to substantial evidence to sustain the convictions against Appellant.

2.

We review the denial of a motion for judgment of acquittal based on the sufficiency of evidence de novo. *See United States v. Farrell*, 921 F.3d 116, 136 (4th Cir. 2019). On appeal, we view "all of the evidence and the inferences to be drawn therefrom in the light most favorable to the Government." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). We must uphold the jury's verdict "if there is substantial evidence in the record to support it." *United States v. Perry*, 757 F.3d 166, 175 (4th Cir. 2014) (internal quotation marks omitted). Substantial evidence means "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted). In our review, we will not overturn a jury verdict based merely on a challenge to witness credibility. *See United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997); *see also United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014) ("[D]eterminations of credibility and resolutions of conflicts in the evidence . . . are within the sole province of the jury and are not susceptible to judicial review." (internal quotation marks omitted)).

a.

Conspiracy Convictions

In order to uphold a conspiracy conviction, "there need only be a showing that the defendant knew of the conspiracy's purpose and some action indicating his participation." *United States v. Whittington*, 26 F.3d 456, 465 (4th Cir. 1994) (alteration and internal quotation marks omitted). "These elements can be shown by circumstantial evidence such as his relationship with other members of the conspiracy, the length of this association, his

22

attitude, conduct, and the nature of the conspiracy." *Id.* (alteration and internal quotation marks omitted); *see also United States v. Roberts*, 881 F.2d 95, 101 (4th Cir. 1989) ("[O]ne may become a member of the conspiracy without full knowledge of all of its details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, . . . even though he played only a minor part."). "An agreement to join -- and participation in -- a conspiracy 'need not be explicit; it may be inferred from circumstantial evidence.'" *United States v. Landersman*, 886 F.3d 393, 407 (4th Cir. 2018) (quoting *Burgos*, 94 F.3d at 858 (internal quotation marks omitted)).

i.

Arson Conspiracy

To sustain a conviction of conspiracy to commit arson, the Government must prove that the defendant conspired to "use[] fire . . . to commit any felony which may be prosecuted in a court of the United States." 18 U.S.C. § 844(h)(1). Here, the underlying felonies were mail and wire fraud conspiracy, mail fraud, and wire fraud in connection with the fires at the Matoaka, Huntington, and Ikes Fork properties.[10]

a.)

As to the arson conspiracy here, Appellant contends the Government "showed only that on a single occasion he drove with others to Huntington, waited in a vehicle during a

---

[10] Of note, Appellant does not dispute the sufficiency of the evidence of his knowledge and participation in the arson conspiracy as to the Matoaka or Ikes Fork property fires.

23

real estate closing and then helped move furniture into a house." Appellant's Br. 22. Appellant also challenges the testimony of Gleason and Toler as "very vague, general and self-interested." *Id.* at 25. The Government argues that the testimony of Gleason, Toler, and Safford, along with the additional supporting evidence adduced at trial, was sufficient evidence to sustain the conviction. In fact, the Government asserts that the testimony of Gleason alone was sufficient to support the arson conspiracy conviction. As noted, Gleason testified that Appellant assisted members of the conspiracy by driving them to the closing of the Huntington property and by loading and moving furniture from his truck into the property in order to stage the arson. The Government also asserts that any credibility issues with the testimony of Gleason and Toler were resolved by the jury.

b.)

Appellant's challenges relative to the credibility of Gleason and Toler are unavailing. We will not disturb the jury verdict in light of the substantial evidence in the record of Appellant's knowledge of and participation in the arson conspiracy. The testimony of Gleason and Toler demonstrated that Appellant was aware of the planned Huntington property fire since the inception. In fact, Appellant drove Gleason to the closing and then used his truck to transport used furniture to the property. Appellant and Gleason then set up an alibi by heading to Las Vegas after staging the fire at the property. While in Las Vegas, Appellant received a call from Windel confirming that he had set fire to the property.

Thus, based on the evidence adduced at trial, we are satisfied that there is substantial evidence to support the jury verdict of arson conspiracy against Appellant.

24

ii.

Money Laundering Conspiracy

In order to obtain a conviction for money laundering pursuant to 18 U.S.C. § 1957, the Government must prove that "the defendant knowingly engaged or attempted to engage in a monetary transaction in the United States involving property with a value greater than $10,000 that was derived from specified criminal activity." *United States v. Vinson,* 852 F.3d 333, 356 (4th Cir. 2017). "Monetary transaction" means "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution. . . ." 18 U.S.C. § 1957(f)(1). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." *Id.* at (f)(2). "Specified unlawful activity" includes mail fraud, wire fraud, and arson to commit mail and wire fraud. *See* 18 U.S.C. § 1956(c)(7). Here, each of these three specified unlawful activities were in connection with the fires at the Matoaka, Huntington, and Ikes Fork properties.

In addition, 18 U.S.C. § 1956(h) provides "[a]ny person who conspires to commit any offense defined in [section 1956] or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

25

a.)

As to the money laundering conspiracy conviction,[11] Appellant contends that the testimony of Bledsoe and Safford and the evidence of his monetary transaction with Windel was not sufficient to sustain his conviction. Appellant asserts that the Government failed to prove he knew that the September 30, 2013 check he deposited on October 4, 2013, was fraudulently obtained. To the contrary, Appellant claims Bledsoe's testimony proves that he had nothing to do with the Matoaka property fire. Appellant asserts, "Bledsoe not only offered no testimony to show that [he] knew that the check . . . had been procured through fraud, Bledsoe testified that Appellant 'absolutely 100% had nothing to do with the fire.'" Appellant's Br. 32 (quoting J.A. 404). Appellant further asserts that the testimony of Safford about his conversation with Appellant merely recounts in general terms the allegations against Appellant and is not specific enough to prove such allegations. Appellant also claims that, even if he did discuss how he wished to help his friend Toler make some money, the testimony of Safford "does not align with any allegation against [Appellant] in this matter." *Id.* at 30.

b.)

We conclude that the testimony of Bledsoe and Stafford and the documentary evidence of the October 16, 2013 monetary transaction were sufficient to sustain Appellant's conviction for money laundering conspiracy.

---

[11] Appellant does not dispute the sufficiency of the evidence of his knowledge and participation in the money laundering conspiracy as to the Huntington or Ikes Fork property fires.

Despite the fact that Bledsoe testified that Appellant "100 percent" had nothing to do with the Matoaka property fire, J.A. 404, Bledsoe's testimony nonetheless supports the jury verdict against Appellant. Bledsoe's testimony proves that, at the very least, Appellant funneled the ill-gotten gain from Bledsoe's insurance proceeds from the Matoaka property fire to Windel. The funneling of money between father and son who were allegedly involved in arsons which were similarly executed with accelerants obtained from the Center is further support for the conspiracy conviction. In all, the evidence demonstrated that Appellant knew of the plan to launder the insurance proceeds from the property fire and that Appellant aided in this plan by driving Bledsoe to deposit Bledsoe's insurance check in Appellant's account.

Therefore, we uphold the jury verdict as to Appellant's money laundering conspiracy conviction. There was more than sufficient evidence to support it.

b.

Substantive Money Laundering Convictions

Pursuant to 18 U.S.C. § 2(a), a person who "aids, abets, counsels, commands, induces[,] or procures [an offense's] commission [] is punishable as a principal." The statute "does not set forth an essential element of [an] offense with which the defendant is charged or itself create[s] a separate offense." *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010). Rather, "aiding and abetting simply describes the way in which a defendant's conduct resulted in the violation of a particular law." *Id.*

27

i.

a.)

Concealment

By 18 U.S.C. § 1956(a)(1), Congress prohibits four forms of money laundering, including concealment money laundering. *See United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003); *see also* 18 U.S.C. § 1956(a)(1)(B)(i). Here, Appellant was convicted of concealment money laundering. To obtain a conviction for concealment money laundering, the Government must prove the following four elements:

> (1) the defendant conducted or attempted to conduct a financial transaction having at least a *de minimis* effect on interstate commerce or involving the use of a financial institution which is engaged in, or the activities of which have at least a *de minimis* effect on, interstate commerce;
>
> (2) the property that was the subject of the transaction involved the proceeds of specified unlawful activity;
>
> (3) the defendant knew that the property involved represented the proceeds of some form of unlawful activity; and
>
> (4) the defendant knew that the transaction was designed in whole or part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity.

*Farrell*, 921 F.3d at 137.

b.)

Unlawful Monetary Transaction

As set forth above, 18 U.S.C. § 1957 requires the Government to prove "the defendant knowingly engaged or attempted to engage in a monetary transaction in the

28

United States involving property with a value greater than $10,000 that was derived from specified criminal activity." *Vinson,* 852 F.3d at 356.

ii.

We conclude that substantial evidence supports the jury verdict for the charged substantive money laundering offenses. Here, the specified unlawful activities were mail fraud, wire fraud, and arson to commit mail and wire fraud in relation to the Matoaka property fire. The transaction at issue was the deposit of a cashier's check purchased by Appellant in the amount of $11,960 into Windel and Georgetta's joint account at Pioneer Bank on October 16, 2013. The evidence demonstrates that the cashier's check represented reimbursement for Windel and Georgetta's purchase of a 2014 Chevrolet Impala.

As discussed above regarding the money laundering conspiracy, the evidence demonstrated that Appellant had knowledge of the plan to set fire to the Matoaka property. For his part in the conspiracy, Appellant aided the commission of the money laundering offenses by acting as a conduit for the transfer of Bledsoe's fraudulently obtained insurance proceeds to Windel. As a result, we conclude that there was sufficient evidence to sustain the convictions for money laundering to conceal and unlawful monetary transaction.

C.

<u>Motion for New Trial</u>

1.

We review the denial of a motion for a new trial for abuse of discretion. *See United States v. Garcia*, 855 F.3d 615, 619 (4th Cir. 2017). We will not overturn a jury verdict and grant a new trial based on the weight of the evidence except in the "rare circumstance"

29

where "the verdict is against the great weight of the evidence." *Id.* at 620 (internal quotation marks omitted).

### 2.

Appellant presents the same arguments in support of his motion for new trial as those he offered in support of his motion for judgment of acquittal. As discussed above regarding the motion for judgment of acquittal, we conclude the Government presented sufficient evidence of Appellant's guilt beyond a reasonable doubt as to his knowledge of and participation in the arson and money laundering conspiracies, as well as his aiding and abetting in the money laundering offenses.

Because the jury verdict is not against the great weight of evidence, we conclude the district court properly determined that Appellant's case did not present a rare circumstance justifying a new trial.

### D.

### Sentencing

### 1.

"We review a district court's sentence for an abuse of discretion." *United States v. Provance*, 944 F.3d 213, 217 (4th Cir. 2019) (internal quotation marks omitted). "Pursuant to this standard, we review the district court's legal conclusions de novo and factual findings for clear error." *Id.* (internal quotation marks omitted).

We review criminal sentences for their reasonableness. *Gall v. United States*, 552 U.S. 38, 46 (2007). "As we must, we review the sentence for procedural reasonableness *before* addressing whether it is substantively reasonable." *Provance*, 944 F.3d at 215

(emphasis in original). A sentence is procedurally reasonable if it is free of any "significant procedural error, such as . . . failing to consider the [18 U.S.C. §] 3553(a) factors . . . [and] failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. We assess substantive reasonableness by "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.*

2.

Appellant challenges both the procedural and substantive reasonableness of his sentence. As to procedural reasonableness, Appellant asserts that the district court erred by granting a two-level rather than a four-level role reduction. Appellant additionally asserts that the district court procedurally erred by failing to consider and reject his four variance arguments when explaining its sentence. These arguments were (1) Appellant's need to support his family and their dependence on him; (2) his lack of criminal history; (3) the need to avoid unwarranted sentencing disparities among his co-conspirators; and (4) Appellant's lack of the same opportunity as his co-conspirators to plead guilty.

As to substantive reasonableness, Appellant asserts that 60 months of imprisonment is an unreasonable and greater than necessary sentence in light of the § 3553(a) factors.

The Government contends that the sentence is both procedurally and substantively reasonable. The Government asserts that the district court correctly calculated the Guidelines range, considered the parties' arguments, and appropriately considered the § 3553(a) factors.

a.

Procedural Reasonableness

i.

Role in the Offense

Pursuant to the Guidelines, the base offense level is decreased by two levels when the defendant served as "a minor participant in [the] criminal activity," U.S.S.G. § 3B1.2(b), or by four levels when the defendant served as "a minimal participant in [the] criminal activity." *Id.* at § 3B1.2(a). The minor participant adjustment is intended to cover defendants who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* at § 3B1.2 cmt. n.5. The minimal participant adjustment "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of [the] group." *Id.* at § 3B1.2 cmt. n.4. Notably, "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." *Id.* In considering whether a defendant played a minor or minimal role in an offense, consideration should be given to these non-exhaustive factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

(v) the degree to which the defendant stood to benefit from the criminal activity.

*Id.* at § 3B1.2 cmt. n.3(C).

Appellant argues that he should have received a four-level reduction because, like Georgetta, he played a minimal role. Appellant also asserts that the district court mischaracterized his role by stating that he (1) physically started the fire at the Huntington property; (2) staged or set up the property to be burned; (3) went to Las Vegas to establish an alibi; and (4) inquired about the insurance proceeds from the property. In response, the Government argues that Georgetta and Appellant did not play comparable roles. In support of its position, the Government asserts, "[Georgetta] wasn't the one out setting the match, staging the houses, in essence causing these fires and helping these fires to happen and putting other people in danger." J.A. 999.

All told, we cannot conclude the district court abused its discretion in applying the two-level reduction as opposed to a four-level reduction as urged by Appellant. The district court thoroughly detailed the "significant difference between [Appellant] and [Georgetta]." J.A. 1000. The district court explained that, unlike Georgetta, Appellant "helped stage the Huntington property, set it up to be burned" and "knew the fire was going to occur." *Id.* Appellant then "went [on a] Las Vegas trip with Ricky Gleason to establish an alibi." *Id.* Appellant also "received proceeds" from the arson at the Matoaka property, "deposited [the proceeds] in [his] bank account," and "purchased a cashier's check that was provided to

33

Windel."[12]  *Id.*  Accordingly, the district court determined that "[Appellant] was deeply involved here, much more so in the whole scheme than [Georgetta] was, with knowledge of the whole scheme."  *Id.*

Consequently, we hold that the district court did not abuse its discretion in concluding that Appellant played a minor role.

ii.

Explanation of Sentence

We require district courts to "address or consider all non-frivolous reasons presented for imposing a different sentence and explain why [it] has rejected those arguments." *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019).  "The adequacy of the sentencing court's explanation depends on the complexity of each case.  There is no mechanical approach to our sentencing review."  *United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017).  But "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."  *Rita v. United States*, 551 U.S. 338, 356 (2007).

"This individualized assessment requires that district courts consider the defendant's nonfrivolous arguments for a downward departure, impose an individualized sentence based on the characteristics of the defendant and the facts of the case, and explain

---

[12] Appellant did not object during sentencing as to what he now asserts are erroneous facts.  Therefore, this aspect of Appellant's appeal may be reviewed for plain error.  *See United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining a plan error affects substantial rights).  But, in any event, Appellant cannot prove that the district court erred in its minor role conclusion, much less plainly erred.

the sentence chosen." *Blue*, 877 F.3d at 518 (citing *Gall*, 552 U.S. at 50). "Therefore, a perfunctory recitation of the defendant's arguments or the [18 U.S.C.] § 3553(a) factors without application to the defendant being sentenced does not demonstrate reasoned decisionmaking or provide an adequate basis for appellate review." *Id.* (internal quotation marks omitted).

We may, at times, "discern a sentencing court's rationale from the context surrounding its decision." *Ross*, 912 F.3d at 745. Engaging counsel in a discussion about the merits of an argument in favor of a particular sentence, for example, may be sufficient for us to "infer that a sentencing court gave specific attention to a defendant's argument." *Blue*, 877 F.3d at 521 (citing *Gall*, 522 U.S. at 55). Nevertheless, we "may not guess at the district court's rationale, searching the record for statements by the Government or defense counsel or for any other clues that might explain a sentence." *Ross*, 912 F.3d at 745 (internal quotation marks omitted).

Appellant argues that the district court erred by failing to consider and reject his four variance arguments when explaining its sentence. However, in our review of the record, we conclude the district court did, in fact, consider and reject each of Appellant's four arguments.

a.)

Appellant made two separate variance arguments about his history and characteristics. In this respect, Appellant asserted that his (1) desire to support his family and their dependence on him and (2) lack of criminal history warranted a sentence below the Guidelines.

35

As to Appellant's family support and dependence argument, the district court flatly rejected this argument. During his allocution, Appellant expanded upon his argument, explaining how he desired to return home to his wife and kids. In response to Appellant, the district court explained, "Well, you should have thought of them before you burned down somebody's house, [Appellant]. That's all I have to say about that." J.A. 1008. Thereafter, in support of a within Guidelines sentence, the Government asserted, although Appellant "ha[d] a lovely wife and kids," "[h]e had those when he was committing these crimes." *Id.* at 1010. As evident by its subsequent recognition of its "heavy obligation . . . to impose a sentence" and its imposition of a sentence within Guidelines, *id.* at 1014, the district court accepted the Government's argument over Appellant's argument. Then, as to Appellant's criminal history, after imposing a within-Guidelines sentence of 60 months of imprisonment, the district court noted its consideration of the §3553(a) factors and applicable case law. The district court then noted the severity of the case warranted its imposed sentence. Specifically, the district court expressed that it was "under a heavy obligation in this type of case to impose a sentence that will have hopefully a significant deterrent impact upon others." *Id.* at 1014–15. The combination of the district court's consideration of the § 3553(a) factors and applicable case law and its heavy obligation to impose a sentence of 60 months of imprisonment demonstrates that the district court considered and rejected Appellant's lack of criminal history argument.

Thus, as to Appellant's history and characteristics arguments, we conclude that the district court did not abuse its discretion.

Appellant also asserts that the district court failed to avoid unwarranted sentencing disparities among him and his co-conspirators. For this argument, Appellant focuses specifically on the sentencings of Bledsoe (24 months of imprisonment), Georgetta (36 months of imprisonment), and Gleason (15 months of imprisonment[13]).

A district court must ensure uniformity among sentences based on "particular criminal conduct that co-conspirators may share . . . [and] other factors that often vary between co-conspirators like acceptance of responsibility and assistance to the government." *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996). "Section 3553(a)(6)'s avoidance of unwarranted sentencing disparities does not require courts to sentence similarly individuals who go to trial and those who plead guilty. They are not similarly situated for sentencing purposes." *United States v. Susi*, 674 F.3d 278, 288 (4th Cir. 2012). In other words, a district court must compare apples to apples rather than "apples [to] oranges." *United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006).

Here, we conclude the district court properly avoided unwarranted sentencing disparities among Appellant and his co-conspirators. As the district court noted, Bledsoe was not similarly situated to Appellant because Bledsoe "pled guilty, accepted responsibility, and cooperated with the Government." J.A. 1005. Gleason did the same. In contrast, Appellant chose to proceed to trial. As a result, the district court was not

---

[13] The record does not contain facts establishing Gleason's sentence. However, Appellant proffered Gleason's sentence as 15 months of imprisonment. *See* Appellant's Br. 17.

required to sentence Appellant and Bledsoe and Gleason similarly. And, for the reasons set forth supra, Part II.D.2.a.i, regarding Georgetta and Appellant's respective roles in the conspiracies, the district court was not required to sentence Appellant similarly to Georgetta, who played less of a role than Appellant.

c.)

Appellant further argues that he did not have the same opportunity as his co-conspirators to plead guilty, but, like his other arguments, this one also fails. Appellant claims that the purported sentencing disparity exists because he did not have the same opportunity to receive acceptance of responsibility as his co-conspirators. At sentencing, Appellant acknowledged that the Government offered him a plea agreement where he would plead guilty to Count Twenty-Seven, which carries a mandatory minimum sentence of ten years of imprisonment. In this regard, Appellant claimed he "was in a box in terms of cooperation and acceptance of responsibility that he could not get out of unless he agreed to do 10 years in prison." J.A. 1005–06. He asserted that his other co-conspirators "did not have that same pressure placed on them," and, therefore, "[t]hey were permitted to cooperate and to accept responsibility where [he] was never permitted on the same level as them." *Id.* at 1006.

This argument falls flat. Simply put, Appellant declined the Government's offer and chose to go to trial because he did not like what the Government had to offer him. As the Government aptly asserted in response to Appellant's argument, Appellant made this choice and thus "he needs to bear responsibility for it." J.A. 1010. Thus, the district court did not need to consider this frivolous argument. *See Ross*, 912 F.3d at 744 (explaining a

38

district court's obligation to consider all "*non-frivolous* arguments advanced by [ ] counsel" for a sentence (emphasis supplied)); *Blue*, 877 F.3d at 518 (same). As a result, we hold that Appellant's sentence was procedurally reasonable.

Accordingly, we turn now to an evaluation of whether Appellant's sentence was substantively reasonable.

b.

Substantive Reasonableness

In order to prevail on an argument that a sentence was substantively unreasonable, Appellant must demonstrate that "the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014). We must "give due deference to the [d]istrict [c]ourt's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence." *Gall*, 552 U.S. at 59–60.

We conclude that here the district court made a reasoned decision that the § 3553(a) factors, on the whole, justified the sentence of 60 months of imprisonment. The district court reasoned that the sentence had a significant deterrent effect to others in light of the "significant [arson] problem in this district." J.A. 1015. And, given the scope of Appellant's participation in the conspiracy, the district court "believe[d] that [Appellant] was deeply culpable in the situation." *Id.* The district court noted, "[Appellant] was aware of the illegal activities of his father and his brother and he tried to distance himself from involvement . . . but he was significantly involved with awareness of what was going on." *Id.* The district court further opined that the arsons in this case "exposed firefighters, other first responders, and neighbors to potential injuries and even death." *Id.* In addition to

39

these potential physical injuries, the district court highlighted the actual financial injuries sustained as a result of the arsons. "The financial losses to insurance companies [] resulted in increased costs to every homeowner in southern West Virginia through rising insurance premiums." *Id.*

Based on the record as a whole, we readily conclude that Appellant's sentence of 60 months of imprisonment is well reasoned and substantively reasonable.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*